IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SYDNEY S. HART,

    *Plaintiff*,

v.

JACOB J. LEW, Secretary, U.S.
Department of the Treasury,

    *Defendant*.

Civil Action No. ELH-12-03482

## MEMORANDUM OPINION

Sydney Hart, a male-to-female transsexual, filed suit, *pro se,* against the Department of the Treasury (the "Department"),[1] alleging sex discrimination in employment (Count I) and retaliation (Count II), in violation of Title VII of the Civil Rights Act of 1964, codified, as amended, at 42 U.S.C. §§ 2000e *et seq. See* Complaint ¶¶ 122–136 (ECF 1). At the relevant time, Hart worked as a Revenue Agent for the Internal Revenue Service ("IRS") but was discharged from her position.

Now pending is defendant's "Motion to Dismiss, Or, in the Alternative, for Summary Judgment" ("Motion," ECF 22), supported by a memorandum of law ("Memo," ECF 22-1) and an extensive record of prior administrative proceedings related to plaintiff's claims (ECF 22-2, 22-4). Along with her Opposition to the Motion ("Opp." or "Opposition," ECF 26), plaintiff has

---

[1] Plaintiff initially brought suit against the Department of the Treasury. *See* ECF 1. However, in a Title VII action, "the head of the department, agency, or unit as appropriate shall be the defendant." 42 U.S.C. § 2000e-16(c). In ECF 22-1, the Department stated that Neal Wolin, Acting Secretary, "should be substituted in his official capacity as the sole Defendant." ECF 22-1 at n.1. However, Jacob J. Lew was confirmed as Secretary of the Treasury on February 27, 2013. Accordingly, the Clerk is directed to substitute Secretary Lew as the defendant, in his official capacity.

filed an affidavit under Fed. R. Civ. P. 56(d), challenging defendant's request for the pre-discovery conversion of the motion to dismiss to a motion for summary judgment. Defendant has replied (ECF 27).

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I will construe defendant's Motion as a motion to dismiss, and I will grant it in part and deny it in part.

## I. Factual Summary[2]

Hart was employed by the IRS, a sub-agency of the Department, from April 3, 2006 until May 20, 2011. Plaintiff underwent gender reassignment surgery on November 3, 2009. Compl. ¶ 1. Prior to the surgery, plaintiff was known as Stuart Hart.[3]

From the inception of her employment, Hart filed numerous complaints regarding various actions taken by her supervisors and coworkers. Plaintiff's first complaint arose out of an incident that occurred on June 9, 2006, while plaintiff was still expressing as a male.[4] Plaintiff alleges that he appeared at work in "jeans and a shirt," and his on-the-job instructor, Larry Norris, told him that his attire was not appropriate for the office. *Id.* ¶ 6. Norris reminded plaintiff that he was still a probationary employee and advised him to "watch the way [he] conducted himself" so as to avoid termination. *Id.* Two weeks later, plaintiff met with Mary

---

[2] The facts are gleaned largely from the Complaint. As required, I have assumed the truth of the factual allegations and construed them in the light most favorable to plaintiff. *See, e.g.*, *Brockington v. Boykins*, 637 F.3d 503, 505–06 (4th Cir. 2011). However, because the Complaint consists of 34 pages, it is difficult to recount all of the factual allegations.

[3] Plaintiff has amended her birth certificate, passport, Social Security Administration records, and driver's license to reflect her new name and gender. ECF 1 at 1.

[4] Like plaintiff, I use masculine pronouns when referring to the plaintiff in connection with events prior to February 2009, when plaintiff began Hormone Replacement Therapy.

Jones, his first-line supervisor; they discussed the allegedly inappropriate attire plaintiff had worn on June 9 and Jones' perception that plaintiff needed to improve in his interactions with others. *Id.* ¶¶ 5, 7. One month later, on July 13, 2006, plaintiff filed an informal Equal Employment Opportunity ("EEO") complaint with the IRS about the series of incidents. *Id.* ¶ 8. However, after another meeting with Jones, plaintiff voluntarily withdrew the complaint. *Id.* ¶¶ 8–9.

On August 16, 2006, Norris rated plaintiff negatively on two performance reviews, which allegedly led another of plaintiff's supervisors, LaTosha Keown, to reduce plaintiff's caseload. *Id.* ¶ 10. In response, plaintiff filed an EEO complaint, alleging retaliation and discrimination based on sexual orientation and race.[5] *Id.* ¶ 11. In addition, plaintiff met with Jones on September 1, 2006, to discuss the negative performance reviews. Jones acknowledged factual inaccuracies in the reviews and agreed to revise them but, according to plaintiff, she failed to do so. *Id.* ¶ 13. On September 15, 2006, plaintiff entered into an EEO Settlement Agreement ("Settlement Agreement #1") with the Department.[6] *Id.* ¶ 17. The Agreement provided, among other things, that the Department would revise the disputed performance reviews. *Id.*

Plaintiff received citations for two instances of misconduct in late 2006 and early 2007. According to Hart, both were issued in retaliation for the prior EEO complaints. As to the first incident, Norris reported that plaintiff was "deliberately avoiding [him] in the hallways." *Id.*

---

[5] Plaintiff does not specify her own race, but indicates that Jones is "a black female . . . ." Compl. ¶ 5. Hart does not indicate where she filed the EEO complaint, but presumably it was again with the IRS.

[6] Throughout the course of her employment, plaintiff and the Department entered into six separate settlement agreements with regard to plaintiff's EEO claims. The settlements were entered on September 15, 2006, *id.* ¶ 17, July 21, 2010, *id.* ¶ 86, October 14, 2010, *id.* ¶ 97, February 1, 2011, *id.* ¶ 114, March 11, 2011, *id.* ¶ 115, and May 15, 2012, *id.* ¶ 121.

¶ 18.  The second citation arose out of allegations that plaintiff acted disruptively during a workshop on November 17, 2006.  *Id.* ¶ 26.

Plaintiff discussed the first issue with Jones on two occasions.  During the second discussion, on November 1, 2006, Jones stated that she would "officially document" the incident.  *Id.* ¶ 19.  Thereafter, on November 3, 2006, Hart filed an EEO complaint, alleging that he was being retaliated against for his prior EEO activity.  *Id.* ¶ 20.  Jones issued a memorandum to plaintiff on November 21, 2006, stating that he had acted unprofessionally by avoiding Norris in the hall.  According to plaintiff, Jones stated that Territory Manager Peter Hendricks, plaintiff's "second-line supervisor," directed Jones to issue the memorandum.  Compl. ¶¶ 5, 21.  *Id.* ¶ 21.  On December 1, 2006, fearing "further reprisal," plaintiff withdrew the EEO complaint he had filed on November 3, 2006.  *Id.* ¶ 22.

With regard to the second citation, Jones notified plaintiff on January 18, 2007, that she would formally document the incident.  Plaintiff voiced his suspicion that the threatened censure was "reprisal for Plaintiff's prior EEO activity."  *Id.* ¶ 26.  Jones formally documented the incident on February 12, 2007.  *Id.* ¶ 27.  On February 14, 2007, plaintiff "contacted the EEO office to lodge another complaint."  *Id.* ¶ 28.

In the interim, on December 23, 2006, the IRS notified plaintiff that he had been "found suitable for his position as a Revenue Agent."  *Id.* ¶ 24.

The National Treasury Employees Union ("NTEU") filed three grievances on plaintiff's behalf in 2007 and 2008.[7]  The first grievance alleged that Hendricks, plaintiff's Territory

---

[7]  The collective bargaining agreement between the IRS and the NTEU establishes a grievance procedure for union members who believe they have suffered employment discrimination.  An aggrieved employee may challenge the alleged discrimination under Title

Manager, refused to use plaintiff's proper entrance-on-duty date when assigning priority for selection of office space. *Id.* ¶ 30. Three days later, the matter was apparently resolved when Jones informed plaintiff that Hendricks would use the proper date. *Id.* ¶ 31. Jones also agreed to allow plaintiff to telecommute to the office (*i.e.* to work from home). *Id.* The second grievance was filed on June 21, 2007, *id.* ¶ 33, and arose out of plaintiff's annual performance appraisal on June 7, 2007, pertaining to the period of April 6, 2006 to February 28, 2007. *Id.* ¶ 32. According to Hart, the appraisal was due by April 1, 2007. *Id.* Although Jones and Hendricks awarded plaintiff a rating of "Fully Successful" in all job performance categories, *id.*, the grievance was filed because the review failed to include narrative descriptions of "critical job elements" (as allegedly required by an Agreement between the IRS and the NTEU). *Id.* ¶ 33. Hendricks denied that grievance on October 9, 2007. *Id.* ¶ 38. The NTEU filed a third grievance on May 19, 2008, alleging that management "obstructed Plaintiff's promotional opportunities." *Id.* ¶ 41. Hendricks denied the grievance on June 19, 2008. *Id.* ¶ 42.

In the meantime, in September 2007, the NTEU steward notified Hendricks that counseling memoranda issued to plaintiff on November 26, 2006, and February 12, 2007 regarding his "poor workplace interactions" were untimely, because they were issued more than 15 work days after the manager learned of the events. *Id.* ¶ 36. On December 6, 2007, Labor Relations Specialist Philip Wilcox advised that the two counseling memoranda were timely, and that they would not be removed from Hart's personnel file. *Id.* ¶ 39.

---

VII's administrative procedure or under the collective bargaining agreement, but not both. *See generally* 5 U.S.C. § 7121; *Madej v. Brady*, Civ. No. HAR 89-1736, 1990 WL 8039 (D. Md. Jan. 29, 1990), *aff'd*, 911 F.2d 723 (4th Cir. 1990).

Plaintiff began Hormone Replacement Therapy in February 2009. *Id.* ¶ 43. Hart legally changed her first name from Stuart to Sydney on March 9, 2009. *Id.* ¶ 44. That month, plaintiff informed Jones that she had begun her transition from male to female and that because of her hormone therapy, she might "experience hot flashes, mood swings, and emotional lability." *Id.* ¶ 45. Plaintiff also requested a key to the women's restroom so that she could avoid using the men's restroom while dressed as a woman. *Id.* Jones and Hendricks denied her request. *Id.* On April 1, 2009, plaintiff appeared for the first time at the office dressed as a female. *Id.* ¶ 46. Hart surrendered her key to the men's bathroom on April 15, 2009. *Id.* ¶ 47. But, the next day, EEO Territory Manager Sarah Wilson denied plaintiff access to the women's restroom, because she "still had male genitalia." *Id.* ¶ 48.

On July 1, 2009, "while Plaintiff was attempting to secure access to the women's restroom facilities," Hendricks issued plaintiff a "letter of admonishment," claiming that plaintiff had sent several "unprofessional" emails. *Id.* ¶ 49. Five days later, the NTEU filed a grievance on plaintiff's behalf, objecting to the letter of admonishment. *Id.* ¶ 50. The grievance was denied on February 26, 2010. *Id.* ¶ 78.

On July 10, 2009, plaintiff learned that she was promoted to a new position, which required her to transfer from her post in Fairfax, Virginia to Baltimore, Maryland. *Id.* ¶ 51. The transfer was scheduled to take place on August 3, 2009. *Id.* ¶ 53. Hart's new supervisors would be manager Steve Hansen in Baltimore and Barbara Tobias, the "Second-line Manager," in Florida. *Id.* On July 16, 2009, Jones notified Hart that she could use the women's restroom facilities at the Fairfax Office. *Id.* ¶ 52. Hansen and plaintiff executed an agreement on August 3, 2009, allowing plaintiff to telecommute, *i.e.*, to work from home. *Id.* ¶ 55.

In late August and early September 2009, plaintiff and her workgroup attended training workshops in Denver, Colorado and Washington, D.C. *Id.* ¶ 57–58. In both cities, plaintiff's coworkers allegedly ridiculed her, laughed at her appearance, and balked at her use of the women's restroom. *Id.* ¶ 59. Additionally, Hansen allegedly ignored plaintiff on one occasion and "set an improper tone for the workgroup." *Id.* ¶ 61. At a meeting between Hart and Hansen on September 9, 2009, Hansen told Hart that he was angry with Hart for bringing her grievances to the NTEU rather than first addressing them with him. *Id.* ¶ 62. Hansen also told plaintiff that she needed sensitivity training, that her skirts were too short, that Hansen's colleagues in the Fairfax office had informed him that "Plaintiff files too many EEO complaints," and that "the EEO office no longer takes Plaintiff seriously." *Id.*; *see also id.* ¶ 63. In late September and early October 2009, plaintiff notified the EEO office, verbally and in writing, of the incidents involving Hansen. *Id.* ¶ 67. Also in early October, the IRS transferred plaintiff's workgroup. *Id.* ¶ 66. As a result, Director Lori Nichols became Hart's third-line supervisor. *Id.*

On October 22, 2009, Hansen requested that plaintiff, who had been working from home, report to the Baltimore office for a workload review on October 26, 2009. *Id.* ¶ 68. Plaintiff, who "had to prepare" for her impending gender reassignment surgery on November 3, 2009, *id.*, requested that they instead conduct a telephone review. *Id.* Hansen denied the request despite the fact that, according to plaintiff, Hansen knew about Hart's upcoming surgery, *id.*, and regularly conducted telephone reviews with other revenue agents. *Id.* ¶ 70. The workload review did not take place prior to plaintiff's surgery. *Id.* ¶ 75.

Plaintiff underwent reassignment surgery on November 3, 2009, and returned to work on December 16, 2009. *Id.* ¶¶ 72, 73. On January 12, 2010, Hansen met with plaintiff for the

workload review that they had previously failed to conduct. *Id.* ¶ 75. Through Hansen, Tobias charged plaintiff with insubordination based on Hart's failure to meet with Hansen in October 2009. *Id.* Tobias gave plaintiff the choice of a five-day suspension or the option of proposing an alternative form of discipline. *Id.* On February 25, 2010, plaintiff opted to donate twenty-four hours of her annual leave to the IRS Annual Leave Bank. *Id.* ¶ 77.

On April 26, 2010, plaintiff received an annual performance appraisal for the period of March 1, 2009, to February 28, 2010. *Id.* ¶ 79. Plaintiff's overall performance rating was less favorable than it had been the previous year, prior to her surgery. *Id.* Also, "Management failed to provide to Plaintiff her Mid-Year Review" and belatedly issued only one workload review in January 2010. *Id.* ¶ 79. In response to the unfavorable performance review, plaintiff filed an EEO complaint on May 21, 2010, alleging sex discrimination. *Id.* Then, on June 17, 2010, plaintiff emailed Acting Territory Manager Louis Liotine, notifying him that Hansen had treated her "in an inappropriate and unprofessional manner on many numerous occasions, beginning when he learned that [plaintiff] had filed an EEO complaint 4 years ago." *Id.* ¶ 80.

On June 29, 2010, an IRS secretary, Robert Curry, told a coworker that "all the plaintiff does is file grievances." *Id.* ¶ 82. Curry allegedly "spit something into a garbage can" after plaintiff greeted him. *Id.* ¶ 85. However, Curry missed the trash can and then allegedly told plaintiff: "It's a man thing." *Id.* Curry also allegedly told plaintiff that she "needs to learn how to get along with others." *Id.* ¶ 82. Plaintiff reported these incidents to Tobias in two separate emails. *Id.* ¶¶ 82, 85.

On July 21, 2010, plaintiff and the Department entered into a second EEO settlement agreement ("EEO Settlement #2"). They agreed that the EEO office would provide diversity training to plaintiff's workgroup. *Id.* ¶ 86. The training took place on October 5, 2010. *Id.* ¶ 94.

Plaintiff received a mid-year review on September 22, 2010, in which Hansen gave her ratings identical to those she had received in the April annual review. *Id.* ¶ 89. In response, plaintiff filed another EEO complaint on September 22, 2010, alleging sex discrimination and reprisal. *Id.* ¶¶ 89, 90.

Commissioner Shulman sent an email to all IRS employees on September 30, 2010, reaffirming his commitment to equal opportunity. *Id.* ¶ 92. Then, on October 6, 2010, Hansen allegedly criticized the length of plaintiff's skirt, chastised her for contacting NTEU and EEO counselors, and said, "'Why don't you just resign?'" *Id.* ¶ 95. According to plaintiff, Hansen's tone, body language, and facial expressions made her "afraid and fearful." *Id.* After the meeting, plaintiff left Hansen's office, notified him that she was feeling sick, and returned to her home. *Id.* Hansen denied Hart's request for a sick day, instead charging her with 6.5 hours of "AWOL." *Id.*

On October 14, 2010, plaintiff and the Department entered into EEO Settlement Agreement #3, which provided that the Department would work with plaintiff to develop a "Career Learning Plan." *Id.* ¶ 97. That same day, plaintiff emailed several Department employees, informing them that she was "licensed as an armed private investigator awaiting personal protection specialist and security officer arrest authority status." *Id.* ¶ 97. The next day, a Special Agent with the Treasury Inspector General for Tax Administration ("TIGTA") contacted plaintiff with regard to her email of October 14, 2010. *Id.* ¶ 98.

Plaintiff filed an EEO complaint on October 20, 2010, pointing out that an IRS official had reported her to TIGTA less than one day after the execution of Settlement Agreement #3. *Id.* ¶¶ 99, 100. Throughout October 2010, plaintiff and Hansen feuded via email. On multiple occasions, Hansen requested that plaintiff report to the office, plaintiff refused because she was medically unable to work and was fearful of Hansen, and Hansen designated plaintiff as "AWOL." *Id.* ¶¶ 97–104. On October 21, 2010, Hansen terminated plaintiff's telecommuting privileges, which she had held since 2007, and directed her to report to the office as of October 25, 2010. *Id.* ¶ 101.

Tobias emailed plaintiff on October 22, 2010, advising that another manager would be present so as "'to minimize [Hart's] concerns about meeting with [Hansen].'" *Id.* ¶ 102. But, she reiterated that Hart could not work from home. *Id.* Plaintiff responded on October 23, 2010, stating that Tobias' suggestion "was unacceptable, and did not allay [Hart's] fears," given the prospect of "chance encounters" with Hansen while at work. *Id.* ¶ 102. Moreover, Hart claimed she was still experimenting "after-effects" from numerous medical procedures as part of her "gender transition." *Id.* Thus, she was "unable to come off flexiplace."[8] *Id.*

By email of November 2, 2010, Hart wrote to Tobias, accusing her of terminating plaintiff's telecommuting privileges "out of retaliatory spite" and without addressing Hart's "medical and safety concerns." *Id.* ¶ 108. Plaintiff maintained that she was afraid of Hansen and could not report to the office as directed. *Id.* ¶¶ 100, 101, 108.

---

[8] "Flexiplace" is the name of the IRS program that allows employees to work from home. *See Nanette v. Snow*, 343 F. Supp. 2d 465, 474 (D. Md. 2004) *aff'd*, 143 F. App'x 551 (4th Cir. 2005).

In the meantime, plaintiff was interviewed by TIGTA agents on October 27, 2010. Hart described how IRS managers, including Hansen and Tobias, discriminated and retaliated against Hart. *Id.* ¶ 105. Tobias notified plaintiff on November 1, 2010, that two TIGTA Special Agents would come to her residence on November 3, 2010, to secure her files and government items. *Id.* ¶ 107. That night, plaintiff told members of her group that she would be leaving the IRS "due to ongoing sex discrimination and reprisal from Management." *Id.* She also filed a breach of contract claim with the Department's Office of Civil Rights and Diversity, claiming that the IRS had breached EEO Settlement Agreement #3. *Id.*

Both Hansen and Tobias wrote emails to Hart on November 2, 2010, asking if she intended to resign. *Id.* ¶ 108. Plaintiff informed them that she did not intend to resign. *Id.*

Two federal agents went to plaintiff's residence on November 3, 2010, and confiscated her case files and other government property. *Id.* ¶ 109. Five days later, on November 8, 2010, Tobias issued plaintiff a "Proposal to Remove from Federal Service" ("Removal Proposal"). *Id.* ¶ 110. According to plaintiff, the Removal Proposal included a notation signifying that the removal process had begun on October 6, 2010, the day after the Department satisfied the conditions of EEO Settlement #2 by providing diversity training to its employees. *Id.* Hansen continued to designate plaintiff as "AWOL." *Id.* ¶ 113.

On November 18, 2010, Hansen asked Hart to discuss her "Career Learning Plan." But, because the IRS did not intend to withdraw its Removal Proposal, Hart claims the request was "a sham." *Id.* ¶ 111.

Also on November 18, 2010, the EEO gave plaintiff a "Notice of Right to File a Formal Complaint." *Id.* ¶ 112. On February 1, 2011, plaintiff and the Department entered into EEO

Settlement Agreement #4, in which the IRS agreed to reveal the name of the person who, on October 14, 2010, made the TIGTA referral. The terms also included a commitment to the discussion of the importance of EEO and diversity at a senior leadership meeting. *See* ECF 22-4 at Bates No. 00086.

Then, on February 24, 2011, plaintiff filed another EEO complaint, alleging that Tobias had failed to return calls from plaintiff's NTEU representative. *Id.* ¶ 115. Two weeks later, plaintiff and the Department entered into their fifth EEO Settlement Agreement, which provided plaintiff the opportunity to respond to the Removal Proposal by participating in an Oral Reply. *Id.* ¶ 115. The Oral Reply took place on March 24. *Id.* ¶ 116. As part of the Oral Reply, plaintiff included an email from Hansen to Tobias of October 7, 2010, in which Hart explained that she did not discuss her issue with Hansen before filing an EEO complaint, because "'you can't reason with a fool.'" *Id.* ¶ 116.

Hart filed another EEO Complaint on April 11, 2011, alleging that she did not receive her annual performance review for the period of March 2010 through February 2011. *Id.* ¶ 117.

The Department issued its Decision Letter to Hart on May 9, 2011, informing plaintiff of the Agency's decision to dismiss her from her position. *Id.* ¶ 118. Plaintiff contacted an EEO counselor on May 31, 2011, and proceeded to file a formal complaint challenging the termination decision. *Id.* ¶ 119.

The Department issued its Final Agency Decision on April 17, 2012. It found that Hansen had made discriminatory remarks but that plaintiff's termination was not based on sex discrimination or retaliation. *Id.*

Plaintiff and the IRS executed EEO Settlement Agreement #6 on May 15, 2012, with respect to plaintiff's complaint of April 11, 2011. *Id.* ¶ 121. The IRS agreed to provide plaintiff with a copy of a tax training manual. *Id.*

Hart filed suit in the United States District Court for the District of Columbia on May 31, 2012, alleging employment discrimination in violation of Title VII. S*ee* ECF 1. Title VII's venue provision, however, requires that Title VII actions be brought in the judicial district in the state where: (1) the alleged wrongdoing was committed, (2) the relevant employment records are maintained and administered, or (3) the plaintiff would have worked but for the alleged discrimination. 42 U.S.C. § 2000e-5(f)(3). Because "the plaintiff was working at the defendant's office in Baltimore, Maryland, when a substantial part of the alleged misconduct occurred and when she was fired," ECF 17, defendant moved to transfer the case to the District of Maryland. *See* ECF 11. The District Court for the District of Columbia granted the motion on November 7, 2012, ECF 17, and the case was docketed in this Court on November 29, 2012. *See* ECF 18.

## II. Standard of Review

Defendant's motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. The motion is supported by an extensive record of administrative proceedings before the Department of the Treasury. *See* ECF 22-2, 22-4.

The purpose of a motion to dismiss is to test the sufficiency of the complaint. *See McBurrey v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010); *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule

8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted); *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . .") (citation omitted); *see also Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

"A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to relief. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011). Dismissal "is inappropriate unless, accepting as true the well-pled facts in the complaint and viewing them in

the light most favorable to the plaintiff, the plaintiff is unable to 'state a claim to relief.'" *Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011) (citation omitted).

As indicated, under Rule 12(b)(6), the court must assume the truth of all well-pleaded allegations in the complaint, as well as the reasonable inferences drawn from the facts. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Brockington v. Boykins*, *supra,* 637 F.3d at 505–06; *E. I. duPont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). So, it must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events. *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). Nor must it accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

Disputes of fact ordinarily "cannot be decided on a motion to dismiss . . . ." *Andrew v. Clark*, 561 F.3d 261, 267 (4th Cir. 2009). Consequently, a motion pursuant to Rule 12(b)(6) typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint," the court may resolve the applicability of a defense by way of a Rule 12(b)(6) motion. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). "This principle only applies, however, if all facts necessary to the affirmative defense '*clearly appear*[] *on the face of the complaint*,'" or in other documents that

are proper subjects of consideration under Rule 12(b)(6). *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*). Moreover, because Hart is self-represented, her submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Ordinarily, a court "is not to consider matters outside the pleadings . . . when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, a motion styled in the alternative, *i.e.*, to dismiss or for summary judgment, implicates the court's discretion under Fed. R. Civ. P. 12(d) to consider matters outside of the pleadings. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011). A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, *Federal Practice & Procedure* § 1366, at 159 (3d ed. 2004, 2011 Supp.). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165–67.

Where, as here, the movant expressly captions the motion "in the alternative," as one to dismiss or for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). If the court determines to treat

the motion as one for summary judgment under Rule 56, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

Nevertheless, summary judgment is ordinarily inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). In that circumstance, however, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition" without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244–45 (discussing affidavit requirement of former Rule 56(f)). Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC–08–2586, 2011 WL 665321, at *20 (D. Md. Feb. 14, 2011)). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56 request for additional discovery is properly denied "where the additional evidence sought for discovery

would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir. 2008), *cert. denied*, 555 U.S. 885 (2008).

Along with her Opposition, plaintiff submitted an affidavit under Rule 56 asserting a need to conduct discovery. *See* 56(d) Affidavit, ECF 26-1.[9]  In the affidavit, plaintiff avers that, in order to respond to defendant's motion for summary judgment, she "requires the opportunity to depose Defendant and others who have information relevant to the claims of this lawsuit." 56(d) Affidavit at 2.

Defendant insists that the extensive administrative record provides plaintiff with all of the information necessary for her to respond to the motion for summary judgment. *See* Reply at 8. To be sure, the administrative record contains voluminous documentation of plaintiff's claims of discrimination, the steps the Department took to address Hart's claims, the resolution of Hart's claims at the agency level, and affidavits from those Hart accuses of misconduct.  None of the administrative proceedings took place in an adversarial context, however.  *See* 29 C.F.R. § 1614.108 (describing inquisitorial nature of investigation process); 29 C.F.R. § 1614.302 (noting that a complainant in a mixed case complaint is not entitled to a hearing).

In a case such as this one, credibility is often in issue, and cannot be decided by a judge on summary judgment.  Moreover, without depositions, at which plaintiff can cross-examine those she accuses of sex discrimination and retaliation, plaintiff has no means of ferreting out inconsistencies or falsehoods in the statements of her alleged harassers.  *Cf. Goldberg v. Kelly*,

---

[9] Plaintiff's affidavit is erroneously titled "Rule 56(f) Affidavit of Plaintiff Sydney S. Hart."  But, the title of the affidavit does not alter its substance.

397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."); *Elm Grove Coal Co. v. Dir., O.W.C.P*, 480 F.3d 278, 301 (4th Cir. 2007) (extolling virtues of cross-examination). Cross-examination is particularly valuable where, as here, a case turns on the motives and intentions of those alleged of wrongdoing. It is only by subjecting a witness to the rigors of cross-examination that a plaintiff, and eventually a factfinder, can assess the credibility of those who disclaim any improper motivations. *See, e.g.*, 5 *Wigmore on Evidence* § 1367 (3d ed. 1940) (referring to cross-examination as the "greatest legal engine ever invented for the discovery of truth."). And, as defendant acknowledges, the findings made at the administrative level have no force in this Court. *See* Memo at 16 n.7 ("Plaintiff's claims are subject to *de novo* review in this Court.").

Accordingly, I conclude that it would be premature to consider a motion for summary judgment before plaintiff has had an opportunity to engage in discovery. Accordingly, I will consider defendant's motion under Fed. R. Civ. P. 12(b)(6), without converting it into a summary judgment motion under Rule 56.

As noted, a court ordinarily does not "consider matters outside the pleadings" when ruling on a motion to dismiss." *Bosiger*, *supra*, 510 F.3d at 450. However, "when a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (alterations in original) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 606, 618 (4th Cir. 1999)); *see also Philips v. Pitt Cnty. Mem. Hosp.,* 572 F.3d 176, 180 (4th

Cir. 2009) (observing that a court may properly consider documents "attached to the complaint, as well those attached to the motion to dismiss, so long as they are integral to the complaint and authentic" (citations omitted)).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

In her complaint, plaintiff listed each of her settlement agreements and explicitly relied on them in asserting that Raytheon retaliated against her immediately after executing the agreements or fulfilling their terms.  *See, e.g.*, Compl. ¶¶ 17, 86, 97, 110, 114, 115, 121. Moreover, plaintiff has not contested the authenticity of the settlement agreements appended to defendant's Motion.  Accordingly, I will consider them in analyzing various contentions presented by the parties.

### III.  Discussion

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  Moreover, Title VII prohibits employers from discriminating against an employee because the employee has filed a grievance or complaint regarding an employment practice that allegedly violates Title VII's antidiscrimination provision.  *See id.* § 2000e-3(a).[10]

---

[10] Until it was amended in 1972 by the Equal Employment Opportunity Act, Title VII did not protect federal employees.  *See* 42 U.S.C. § 2000e(b) (excluding the United States from the definition of "employer").  In 1972, however, Congress amended Title VII to provide that a federal employee who has exhausted his administrative remedies "may file a civil action as provided in section 2000e–5 of this title" against the "head of the department, agency, or unit, as

Plaintiff claims that the Department violated Title VII by discriminating against her on the basis of sex,[11] because she failed to conform to gender norms, and in retaliation for filing multiple EEO complaints against her employer. Plaintiff's Complaint contains numerous allegations in more than 120 paragraphs of factual averments. But, it does not clearly state which particular employment actions are the subject of her Title VII claim. Construing Hart's Complaint liberally, as I must, *see Pardus*, *supra*, 551 U.S. at 94, I assume plaintiff alleges that the negative performance reviews, letters of admonishment, offensive comments, termination of telecommuting privileges, and her discharge all violated Title VII. Before assessing the merits of plaintiff's claims, however, I must first address whether any of them are properly before the Court.

### A. Timeliness/Exhaustion/Preclusion

Defendant reads plaintiff's complaint as alleging multiple violations of Title VII, but contends that only the allegations related to her discharge are timely. According to defendant, the other claims are barred for failure to exhaust administrative remedies or by the multiple settlement agreements between Hart and the Department. *See* Memo at 7–10. In her Opposition, plaintiff does not appear to contest defendant's assertion, noting only that "the Plaintiff may still use these acts as background evidence to support her claims [of discriminatory termination]."

---

appropriate." 42 U.S.C. § 2000e–16(c); *see Bullock v. Napolitano*, 666 F.3d 281, 283–84 (4th Cir. 2012), *cert. denied*, 133 S. Ct. 190 (2012).

[11] Plaintiff's Complaint uses the term "gender discrimination." *See, e.g.*, Compl. at 30. However, Title VII's text prohibits discrimination on the basis of "sex." *See* 42 U.S.C. § 2000e-2(a)(1). I will use the latter term when discussing plaintiff's substantive discrimination claims, and will use the term "gender" when referring to "gender norms" or "gender stereotyping." *See, e.g.*, *Smith v. City of Salem, Ohio*, 378 F.3d 566, 573–74 (6th Cir. 2004).

Opp. at 2 n.1. Moreover, plaintiff characterizes her claims as "arising from the termination of her employment with the Defendant Agency." *Id.* at 2.

Although a party has been found to abandon a claim by failing to respond to an argument made in a motion, *see Ferdinand–Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010), I am reluctant to so hold where, as here, the plaintiff is self-represented. *Cf. United States v. Sasscer,* Civ. No. Y–97–3026, 2000 WL 1479154, at *2 n.6 (D. Md. Aug. 25, 2000). ("[T]he Court need not grant a motion to dismiss based on the failure to file a timely opposition when the motion is plainly lacking in merit."). Accordingly, I will examine defendant's contentions that, with the exception of the claims related to plaintiff's termination, plaintiff's claims are barred.

As a prerequisite to a civil suit, a federal employee must seek administrative review of her grievance and comply with various administrative procedures. *See Young v. Nat'l Ctr. for Health Serv. Research*, 828 F.2d 235, 237 (4th Cir. 1987). First, the employee must contact an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). In some cases, counseling will result in a withdrawal of the claim or a settlement agreement between the employee and employer; these settlement agreements may include a waiver of the employee's right to file a civil suit concerning the matters that are the subject of the agreement. *See id.* § 1614.504(a); *Campbell v. Geren*, 353 F. App'x 879, 882 (4th Cir. 2009); *Rock v. McHugh*, 819 F. Supp. 2d 456, 468 (D. Md. 2011).

If counseling fails to resolve the matter, the EEO counselor will inform the employee of her "right to file a discrimination complaint within 15 days of receipt of the notice . . . ." 29

C.F.R. § 1614.105(d). If the employee's complaint is one over which the Merit Systems Protection Board ("MSPB") has jurisdiction, *see* 5 C.F.R. § 1201.3, the complaint is deemed a "mixed case complaint" and the employee may proceed on one of two paths: she may file a formal complaint with the agency that allegedly discriminated against her, or she may file an appeal on the same matter with the MSPB (but not both). 29 C.F.R. § 1614.302. Because the MSPB has jurisdiction over claims challenging "terminations of employment," 5 C.F.R. § 1201.3(a)(1), plaintiff's complaint is a mixed case complaint.

Of import here, if an employee files a formal complaint or appeal, but withdraws or settles it before a final decision is issued, the employee has not exhausted her remedies and thus may not file suit. *See, e.g.*, *Khoury v. Meserve*, 268 F. Supp. 2d 600, 610–11 (D. Md. 2003) ("It is well-established that a complainant who withdraws an appeal before the MSPB fails to exhaust administrative remedies and is barred from filing a civil action in federal court."), *aff'd*, 85 F. App'x 960 (4th Cir. 2004); *Vinieratos v. U.S. Dep't of Air Force*, 939 F.2d 762, 770–71 (9th Cir. 1991) ("Previous decisions by this court and others have held that abandonment of the administrative process may suffice to terminate an administrative proceeding before a final disposition is reached, thus preventing exhaustion and precluding judicial review.").

If the aggrieved employee chooses to proceed with a formal complaint with the agency, the agency then conducts an investigation. *See* 29 C.F.R. § 1614.106(e)(2). Under 29 C.F.R. § 1614.108, "the agency shall develop an impartial and appropriate factual record upon which to make findings on the claims raised by the written complaint . . . Agencies may use an exchange of letters or memoranda, interrogatories, investigations, fact-finding conferences or any other fact-finding methods that efficiently and thoroughly address the matters at issue." Notably, the

agency does not conduct a hearing on a mixed case complaint. *Id.* § 1614.302(d)(2). If the aggrieved employee is not satisfied with the agency's final decision, she may appeal the matter to the MSPB or may file a civil action in federal district court. *Id.* § 1614.302(d). With some exceptions not relevant here, the employee must file her civil complaint within 30 days of receipt of the agency's final decision. *Id.* § 1614.310(a).

If an employee fails to comply with the administrative procedures outlined above, she has failed to exhaust her administrative remedies and is barred from filing suit in federal court. *See, e.g.*, *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). "The exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible." *Miles*, 429 F.3d at 491. The filing of an administrative charge, therefore, "is not simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, the charge itself serves a vital function in the process of remedying an unlawful employment practice. *See Balas v. Huntington Ingalls Industries, Inc.*, 711 F.3d 401, 406–7 (4th Cir. 2013).

Notably, the exhaustion requirement is jurisdictional. *See id.* at 406 ("[F]ederal courts lack subject matter jurisdiction over Title VII claims for which a plaintiff has failed to exhaust administrative remedies."); *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300–01 (4th Cir. 2009). And, facts showing the existence of subject matter jurisdiction "must be affirmatively alleged in the complaint." *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999).

To the extent that plaintiff's claims of discrimination and retaliation are premised on any employment action other than her termination, she has not exhausted administrative remedies.

As to those employment actions, plaintiff either never filed an administrative complaint, filed a complaint and later withdrew it, settled her complaint, and/or contractually agreed not to litigate on the subject of the complaint.

As noted, an aggrieved employee seeking to sue in federal court must first file a complaint or MSPB appeal, and she generally must see it through to a final decision. Here, plaintiff completed the above process only for her claim that her termination was discriminatory and/or retaliatory. To be sure, she initiated the process several times by filing EEO complaints with the IRS. But, she either withdrew or settled all of the complaints, other than her complaint of May 31, 2011, challenging her termination. Specifically, she filed EEO complaints on July 13, 2006, *id.* ¶ 8; August 16, 2006, *id.* ¶ 11; November 3, 2006, *id.* ¶ 20; May 21, 2010, *id.* ¶ 79; September 22, 2010, *id.* ¶ 89; October 20, 2010, *id.* ¶ 100; February 24, 2011, *id.* ¶ 115; and April 11, 2011, *id.* ¶ 117, and either settled or withdrew them on August 8, 2006, *id.* ¶ 9; September 15, 2006, *id.* ¶ 17; December 1, 2006, *id.* ¶ 22; July 21, 2010, *id.* ¶ 86; October 14, 2010, *id.* ¶ 97; February 1, 2011, *id.* ¶ 114; March 11, 2011, *id.* ¶ 115; and May 15, 2012, *id.* ¶ 121, respectively.[12]

Moreover, each of the settlement agreements between plaintiff and the Department contains the following waiver (or one functionally equivalent to it):

_____

[12] Plaintiff also alleges that she "contacted the EEO office to lodge another complaint" on February 14, 2007, Compl. ¶ 28, presumably regarding a memorandum Jones issued plaintiff about her allegedly disruptive behavior on November 17, 2006. *See id.* ¶ 27. It is not clear whether plaintiff actually filed an EEO complaint, and if so, whether the complaint was ever resolved. *See* ¶¶ 36, 39 (noting that the NTEU pursued the issue, but not alleging any EEO involvement). To the extent that plaintiff did file a formal complaint that the agency never resolved, she may pursue that claim in federal court pursuant to 29 C.F.R. § 1614.310(g). *See id.* (permitting civil suit "[a]fter 120 days from the date of filing a formal complaint if there is no final action or appeal to the MSPB").

The Aggrieved hereby releases the Agency, its employees, officers, or agents in their official and individual capacities, from any claims or liability relating to the Aggrieved's employment up to and including the execution of this agreement. The Aggrieved waives his/her right to pursue administrative or judicial action in any forum concerning matters relating to his/her allegation(s) and agrees that the Aggrieved will not raise these matters in any future litigation.

*See, e.g.*, ECF 22-4 at Bates No. 00083. In these settlement agreements, plaintiff waived her right to pursue a judicial remedy for (1) the allegedly inappropriate comments about plaintiff's attire on June 9, 2006, *see* ECF 22-4 at Bates No. 00140–42; (2) the August 2006 negative case reviews, *see id.*; (3) comments about her skirt, *see id.* at Bates No. 00135–36; (4) the April 2010 performance appraisal, *see id.*; (5) the September 2010 mid-year review, *see id.* at Bates No. 00126–29; (6) the email reporting her to TIGTA, *see id.* at Bates No. 00090–97; and (7) Tobias' alleged failure to return phone calls from plaintiff's NTEU representative, *see id.* at Bates No. 00081–84.

These settlement agreements also contain a provision that permits the complainant, if she believes that the Department has breached the agreement, to notify the Director of the Office of Civil Rights and Diversity and to "request that the terms of the settlement agreement be specifically implemented or, alternatively, that the complaint be reinstated for further processing." *See, e.g.*, ECF 22-4 at Bates No. 00098; *see* 29 C.F.R. § 1614.504(a). If the Director finds that the Department has not complied with the agreement and the complainant requests reinstatement of her complaint, "[f]urther processing will begin from the point processing ceased under the terms of the agreement." *See, e.g.*, ECF 22-4 at Bates No. 00098; *see* 29 C.F.R. § 1614.504(c). As to those claims that were settled, there are no allegations as to revival of the claims in accordance with this process.

In sum, the allegations that are not related to Hart's termination cannot form the basis of her Title VII claim. As to those allegations, plaintiff either never filed an administrative complaint, withdrew her complaint, settled her complaint, and/or contractually agreed not to litigate on the subject of the complaint. Accordingly, I will grant defendant's motion to dismiss as to all claims in Counts I and II, other than those alleging that plaintiff's termination was the product of discrimination or retaliation. Put another way, the only remaining claims are those regarding Hart's termination, to which I now turn.

The Department issued its Final Agency Decision on April 17, 2012. *Id.* ¶ 119. But, plaintiff did not file suit in federal court until May 31, 2012. *See* ECF 1. Accordingly, her suit was untimely. However, the 30-day filing requirement is not a jurisdictional prerequisite to suit in federal court. Rather, it is akin to a statute of limitations and therefore subject to waiver, estoppel, and equitable tolling. *Zografov v. V.A. Med. Ctr.*, 779 F.2d 967, 969 (4th Cir. 1985); *Medlock v. Rumsfeld*, 336 F. Supp. 2d 452, 462 (D. Md. 2002) *aff'd*, 86 F. App'x 665 (4th Cir. 2004). Because defendant has not contested the timeliness of plaintiff's Complaint, the issue is waived.

### B. Employment Discrimination

In Count I, plaintiff claims that she was subjected to "different treatment on the basis of her gender, because [she] failed to conform to Management's expectations of gender norms," and that "IRS Management routinely impeded [her] gender transition, by failing to accommodate her needs." Compl. ¶ 123. Further, Hart avers that defendant discriminated against her "by treating her differently from and less preferably than similarly-situated male employees . . . ." *Id.* ¶ 124.

In response, the Department argues that "Plaintiff cannot sustain a *prima facie* case of sex discrimination because she was not performing her job at a level that met the Agency's legitimate expectations at the time of her removal and she cannot prove that her removal occurred under circumstances giving rise to an inference of discrimination." Memo at 11. In this regard, defendant also points out that the decisionmakers were members of the same protected class. *Id.* at 13; s*ee, e.g.*, *James v. Verizon*, 792 F.Supp. 2d 861, 869-70 (D. Md. 2011). Further, defendant asserts that plaintiff cannot show that the Department's "legitimate nondiscriminatory reasons" for terminating her employment were "a pretext for discrimination." *Id.* at 14.

As noted, Title VII provides: "It shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). As the statutory language makes clear, Title VII only provides a civil remedy to individuals who were discriminated against on the basis of certain enumerated characteristics, one of which is "sex." *See id.* Plaintiff seems to allege that she was discriminated against based on her sex, because she is a transsexual, and because she failed to conform to gender norms. Defendant does not contend that plaintiff, as a transsexual, is not protected by Title VII's prohibition on sex discrimination, and so I will assume for purposes of this motion that plaintiff is within Title VII's aegis.[13]

---

[13] Courts have disagreed about whether discrimination against transsexuals is discrimination on the basis of "sex" and thus whether a transsexual may state a claim for relief under Title VII when she alleges that she was discriminated against because of her transsexuality. *See generally* Jason Lee, *Lost in Transition: The Challenges of Remedying Transgender Employment Discrimination Under Title VII*, 35 Harv. J. L. & Gender 423, 430 (2012); *compare Schroer v.*

1. Employment Discrimination - Methods of Proof

Title VII prohibits an employer from taking "adverse employment action" against an employee on a prohibited basis. *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Typically, an adverse employment action has been found in cases of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999); *see also James*, 368 F.3d at 376. But, "Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 329 (D. Md. 2003).

In general, there are "two avenues" at trial by which a plaintiff may prove that an adverse employment action amounts to intentional employment discrimination. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc). The first is to offer evidence of discrimination, under "'ordinary principles of proof.'" *Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted). To satisfy ordinary principles of proof, a plaintiff at trial must provide direct or circumstantial evidence of discrimination that is sufficiently probative to meet her burden of proof. *See Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).

---

*Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008) *with Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1082 (7th Cir. 1984).

The second avenue available to the plaintiff at trial is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this approach, the plaintiff must first establish a "prima facie case of discrimination." *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013); *see Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff in an employment discrimination suit is generally required to show that the employer took adverse action against the plaintiff "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If the plaintiff/employee establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle*, 650 F.3d at 336; *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). "If the defendant carries this burden of production," the plaintiff must then prove, by a preponderance of the evidence, "that the proffered reason was not the true reason," and that the plaintiff "has been the victim of intentional discrimination." *See Burdine*, 450 U.S. at 255–56; *see also Reeves*, 530 U.S. at 142.

These two methods of proof establish the standards to prove intentional employment discrimination at trial. *Hill*, 354 F.3d at 284. But, at the motion to dismiss stage, they only serve to inform a court's evaluation of the allegations. Accordingly, in a Title VII discrimination claim, "a complaint in an employment discrimination lawsuit [need] not contain specific facts *establishing* a prima facie case of discrimination under the framework set forth in *McDonnell*

*Douglas.*" *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 508 (2002) (emphasis added). Rather, as with any other claim falling within the purview of Rule 8(a), "to survive a motion to dismiss, the complaint must 'state a plausible claim for relief' that 'permit[s] the court to infer more than the mere possibility of misconduct' based upon 'its judicial experience and common sense.'" *Coleman v. Maryland Court of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010), *aff'd,* —— U.S. ——, 132 S. Ct. 1327 (2012).

### 2. Plaintiff's Discrimination Claim

Plaintiff has alleged facts sufficient to state a claim of sex discrimination in employment that is plausible on its face. Her allegations allow the Court "to draw the reasonable inference" that she was discharged because of her sex, her status as a transsexual, and/or her failure to conform with gender norms. *See Iqbal*, 556 U.S. at 680.

Hart's Complaint is replete with allegations of incidents in which her supervisors made improper remarks or took improper actions based on sex.[14] Further, she alleges that these incidents were motivated by animus or discomfort with plaintiff's status as a transsexual or with her status as a female. For example, plaintiff alleges that Hansen made several inappropriate remarks regarding plaintiff's transition from male to female. In particular, plaintiff alleges that Hansen commented on her appearance, which led another manager to advise Hansen to "[not] even go there," *id.* ¶ 60; "set a tone for the workgroup" that prompted plaintiff to request EEO sensitivity training for the workgroup, *id.* ¶ 61; criticized plaintiff's skirt length, *id.* ¶ 62, 95; made false accusations, *id.* ¶ 83; and was otherwise hostile and disrespectful toward plaintiff, *id.*

---

[14] As noted, plaintiff is barred from premising a stand-alone claim of discrimination on these or other incidents. However, as plaintiff recognizes, *see* Opp. at 2 n.1, she may still use these acts as background evidence to support her claim that her termination was discriminatory and/or retaliatory. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, (2002).

¶ 63. Additionally, plaintiff alleges that Tobias failed to take appropriate disciplinary action after plaintiff reported that a coworker had made inappropriate remarks about Hart's prior EEO complaints and her sex. *Id.* ¶ 108; *see id.* ¶¶ 82, 85.

Moreover, plaintiff alleges that her supervisors attempted to impede her gender transition in at least three ways. First, plaintiff alleges that even after she started Hormone Replacement Therapy, her supervisors repeatedly denied her access to the women's restroom, and in doing so referred to her "male genitalia." Compl. ¶¶ 45, 48. While the restroom dispute was ongoing, Hendricks issued a letter of admonishment to Hart, which plaintiff suggests had more to do with discomfort with her requests for restroom access than with actual misbehavior. *Id.* ¶¶ 49–50. Second, although Hansen did not request medical documentation for plaintiff's use of sick leave unrelated to her gender transition, *id.* ¶ 64, plaintiff alleges that Hansen requested medical documentation for plaintiff's proposed use of sick leave in connection with her sex change surgery. *Id.* ¶ 68. Third, plaintiff alleges that, just prior to her sex change surgery, Hansen refused to accommodate her request for a telephone workload review despite his regular practice of conducting telephone reviews with other revenue agents. *Id.* ¶ 70.

Plaintiff has also alleged that she was treated less favorably after her gender reassignment surgery. For example, plaintiff alleges that Tobias and Hansen decreased her ratings on performance reviews from an average of 4.2 to an average of 3.2 after she returned to work following her surgery, *id.* ¶ 79, and that "the severity and frequency of disciplinary action from IRS Management" increased after she began her transition from male to female. *Id.* ¶ 115.

Defendant does not appear to seriously contest that plaintiff has stated a claim for sex discrimination sufficient to survive a 12(b)(6) motion. Defendant's Motion, styled alternatively

as a motion to dismiss or for summary judgment, speaks almost entirely in the language of summary judgment. For example, the Motion makes extensive references to the administrative record, *see, e.g.*, Memo at 11; argues that plaintiff has failed to make out a *prima facie* case under the *McDonnell Douglas* proof scheme, *see, e.g.*, *id.* at 13; and asserts that plaintiff cannot show that the Department's nondiscriminatory reasons for terminating her employment were pretextual. *Id.* at 14. However, as discussed above, the Court generally does not refer to matters outside of the pleadings in resolving a motion to dismiss, nor does it resolve factual disputes. Moreover, and of critical import here, plaintiff is not required by Rule 8(a) to make out a *prima facie* case at this stage. Put another way, the *McDonnell Douglas* burden-shifting approach, central to defendant's argument, does not apply at the motion to dismiss stage.

Defendant will have the opportunity to rebut plaintiff's contentions and to proffer legitimate, nondiscriminatory reasons for its termination of plaintiff's employment, such as the deficiencies and inadequacies of her performance. *See* Memo at 11 (arguing that "the Agency proposed the removal of Plaintiff based on 14 specifications of failing to follow management directives, two specifications of exhibiting unprofessional behavior, three specifications of failing to follow proper leave procedures, and 15 specifications of being AWOL"); *see also McDonnell Douglas*, 411 U.S. at 802. And, I may ultimately be persuaded by evidence supporting defendant's explanation. However, to survive a motion to dismiss, a plaintiff need only show that she was terminated "under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253. In light of Hart's allegations that her supervisors harbored animus and hostility regarding her appearance, dress, sex, and gender transition, I conclude that she has presented allegations sufficient to withstand a motion to

dismiss.  Accordingly, I will deny defendant's Motion as it relates to plaintiff's claim in Count I that her termination was the product of sex discrimination.

## C.  *Retaliation*

In Count II, plaintiff asserts a claim for retaliation under Title VII.  Hart avers that she filed several EEO complaints and several collective bargaining grievances throughout her employment with the Department.  *See, e.g.*, Compl. ¶ 129.  Further, she alleges that, in retaliation for her complaints, her supervisors took numerous adverse actions against her, leading up to and including her termination.  *Id.* ¶ 130.  The Department assumes for the purposes of its motion that plaintiff has stated a prima facie case of retaliation, but argues that she "she cannot prove that Defendant's legitimate nonretaliatory reasons for her removal are a pretext for retaliation."  Memo at 16.

Title VII prohibits an employer from retaliating against an employee who exercises her Title VII rights.  *See, e.g.*, *Okoli v. City Of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011).  The purpose of Title VII's antiretaliation provision is to maintain "unfettered access to statutory remedial mechanisms" for employees who fear reprisal.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).  In order to establish a *prima facie* claim of retaliation under Title VII, a plaintiff "must show that [she] engaged in protected activity, that [her employer] took adverse action against [her], and that a causal relationship existed between the protected activity and the adverse employment activity." *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).  As with a substantive discrimination claim, the *McDonnell Douglas* framework applies at trial:  "If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears

the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, 650 F.3d at 337 (quoting *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2006)).

As indicated, a plaintiff at trial must establish that she engaged in protected activity. "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). As the Fourth Circuit has said, "[t]o fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 47 F.2d 441, 448 (4th Cir. 1981) (citation omitted).

The second element of the *prima facie* case is an "adverse employment action." In a retaliation claim, the standard for an adverse employment action is more lenient than for a substantive discrimination claim. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 64 (2006) ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). A plaintiff need only show that the challenged action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, *supra*, 548 U.S. at 68 (quotation marks and citations omitted). Nonetheless, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist*, *supra,* 671 F. Supp. 2d at 738 (quoting *Burlington Northern,* 548 U.S. at 68).

To satisfy the third element, a causal connection between the protected activity and the adverse action, a plaintiff at trial must show that "the employer [took] the adverse employment action *because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). The Fourth Circuit "has held that evidence that the alleged adverse action occurred *shortly* after the employer became aware of the protected activity is sufficient to 'satisf[y] the less onerous burden of making a prima facie case of causa[tion].'" *Id.* (quoting *Williams*, *supra*, 871 F.2d at 457) (emphasis and alterations in *Dowe*). Conversely, "the opposite [is] equally true," so that "[a] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two." *Dowe*, 145 F.3d at 657 (finding a period of time exceeding three years too lengthy to give rise to the inference of a causal connection).

Plaintiff's allegations "give rise to an inference" that she was terminated in retaliation for filing numerous complaints and grievances against her supervisors. *See Burdine*, 450 U.S. at 253. The Complaint is replete with allegations that Hart filed countless complaints and grievances throughout her employment, alleging gender discrimination and retaliation. S*ee, e.g.*, Compl. ¶¶ 8, 11, 20, 28, 49, 67, 79, 115, 117, 118. These complaints clearly qualify as "protected activity." *See, e.g.*, *Okoli*, 648 F.3d at 223. And, Hart clearly suffered an adverse employment action when the Department terminated her employment.

Plaintiff has also alleged that she was terminated "because" she engaged in protected activity. According to Hart, her supervisors expressed anger and disapproval with her for repeatedly filing EEO complaints. For example, she alleges that Hansen chastised her for not

having the "guts" to speak with him before contacting an EEO counselor, Compl. ¶ 95; accused her of going "'around his back to the NTEU,'" *id.* ¶ 62; told her that she filed "'too many EEO complaints,'" *id.* ¶ 62; and questioned her about how much time she had spent speaking with EEO counselors, *id.* ¶ 95.  Plaintiff's allegations also demonstrate temporal proximity between her protected activity and the alleged retaliatory action; the Department allegedly began the process of discharging Hart from employment just one day after it fulfilled the terms of Settlement Agreement #2.  *Id.* ¶ 110.

Moreover, plaintiff suggests that her numerous complaints had a cumulative effect; that is, she filed a complaint, was retaliated against, filed a new complaint alleging retaliation, and was retaliated against for that subsequent complaint.  *See, e.g.*, *id.* ¶¶ 27, 95, 130.  Her allegations of retaliatory action during her employment include allegations that the Department issued letters of admonishment to her, deprived her of promotional opportunities given to other employees, terminated her telecommuting privileges, and repeatedly designated her as "AWOL"—all as punishment for her protected activity.  *See, e.g.*, *id.* ¶¶ 26, 62, 80, 103, 108, 110, 119, 130.  Plaintiff's allegations that she was retaliated against multiple times throughout her employment support her assertion that she was fired in retaliation for her history of complaints.

As with plaintiff's sex discrimination claim, defendant does not seriously contest that plaintiff has stated a claim for retaliation sufficient to survive a 12(b)(6) motion.  Instead, defendant argues that plaintiff "cannot prove that Defendant's legitimate nonretaliatory reasons for her removal are a pretext for retaliation."  Memo at 16; *see also id.* at 17 ("Plaintiff cannot show by a preponderance of the evidence . . . .").  But, to survive a motion to dismiss, plaintiff

need not *prove* anything. Indeed, she need not even *allege* that defendant's proffered explanation is a pretext. This, of course, is because a plaintiff, when filing her complaint, does not yet know what explanation a defendant will proffer and has not yet had the opportunity to uncover evidence of pretext. Plaintiff need only allege sufficient facts that, when taken as true, establish the plausibility of her claim.

Defendant's Motion is largely written in the language of summary judgment. Because I have declined to convert defendant's Motion into one for summary judgment, many of defendant's arguments are inapplicable at this stage of the proceedings. Although these arguments may become applicable upon the conclusion of discovery, it would be premature to consider them at this juncture. Given that plaintiff has adequately alleged facts that establish the plausibility of her claim that her termination was retaliatory, I will deny defendant's Motion as it relates to plaintiff's claim in Count II that her termination was retaliatory.

**CONCLUSION**

For the foregoing reasons, the Department's Motion is granted in part and denied in part. A separate Order, consistent with this Memorandum, follows.


Date: September 23, 2013                    _____/s/_____

                                            Ellen L. Hollander
                                            United States District Judge


- 38 -