IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SYDNEY S. HART,

    *Plaintiff*,

    v.

                        Civil Action No. ELH-12-03482

JACOB J. LEW, Secretary, U.S.
Department of the Treasury,

    *Defendant*.

**MEMORANDUM OPINION**

Sydney S. Hart, a male-to-female transsexual, filed suit, *pro se*, against the Department of

the Treasury ("Treasury"),[1] alleging sex discrimination in employment (Count I) and retaliation

(Count II), in violation of Title VII of the Civil Rights Act of 1964, codified, as amended, at 42

U.S.C. §§ 2000e *et seq.  See* Complaint ¶¶ 122–136 (ECF 1).[2]  At the relevant time, Hart worked

---

[1]  In a Title VII action, "the head of the department, agency, or unit as appropriate shall be the defendant."  42 U.S.C. § 2000e-16(c).  In ECF 22-1, the Department stated that Neal Wolin, Acting Secretary, "should be substituted in his official capacity as the sole Defendant."  ECF 22-1 at n.1.  However, Jacob J. Lew was subsequently confirmed as Secretary of the Treasury on February 27, 2013.  Accordingly, the Clerk was directed to substitute Secretary Lew as the defendant, in his official capacity.  *See* ECF 28 at 1 n.1.

[2]  Hart filed suit in the United States District Court for the District of Columbia.  ECF 1.  Title VII's venue provision requires that Title VII actions be brought in the judicial district in the state where: (1) the alleged wrongdoing was committed, (2) the relevant employment records are maintained and administered, or (3) the plaintiff would have worked but for the alleged discrimination.  42 U.S.C. § 2000e-5(f)(3).  Because "the plaintiff was working at the defendant's office in Baltimore, Maryland, when a substantial part of the alleged misconduct occurred and when she was fired," ECF 17, defendant moved to transfer the case to the District of Maryland.  *See* ECF 11.  The District Court for the District of Columbia granted the motion on November 7, 2012.  ECF 17.  The case was docketed in this Court on November 29, 2012.  *See* ECF 18.

as a Revenue Agent for the Internal Revenue Service ("IRS").  While working for the IRS, Hart transitioned from male to female.  Hart was removed from employment effective May 20, 2011.

Plaintiff's Complaint has already survived defendant's motion to dismiss (ECF 22), in part.  On September 23, 2013, I dismissed all of Hart's allegations, other than the allegation that she was fired because of defendant's discriminatory or retaliatory animus.   ECF 28 (Memorandum); ECF 29 (Order).  In my Memorandum Opinion, I stated:  "[T]he allegations that are not related to Hart's termination cannot form the basis of her Title VII claim.  As to those allegations, plaintiff either never filed an administrative complaint, withdrew her complaint, settled her complaint, and/or contractually agreed not to litigate on the subject of the complaint." ECF 28 at 27.  Accordingly, the only issues that remain are: 1) whether defendant terminated Hart because of her sex; and 2) whether defendant terminated Hart in retaliation for protected Title VII enforcement activities.

Now pending is defendant's Motion for Summary Judgment.   ECF 44 ("Motion").  Defendant has supported the Motion with a memorandum of law (ECF 44-1, "Memo"), the complete transcript of a deposition of Hart conducted on February 25, 2014 (ECF 44-3, "Hart Depo."), and a selection of emails.  *See* ECF 44-2 (exhibit list).  Hart opposes the Motion (ECF 48, "Opposition"), and has submitted 143 exhibits that have been filed with the Court only in paper copy.  *See* ECF 48.[3]   The exhibits include emails, Equal Employment Opportunity ("EEO") complaints filed by Hart, personnel records, and materials from Treasury's investigations of Hart's EEO complaints, including declarations from key individuals. Defendant has replied.  ECF 49 ("Reply").

---

[3] Because Hart's exhibits have not been electronically filed, I will cite to them using the exhibit and page numbers that are handwritten on the documents.

The Motion has been fully briefed, and no hearing is necessary to resolve it.  *See* Local Rule 105.6.  The evidence shows that Hart repeatedly, expressly asked to be fired, and she finally got her "wish" when she vowed never to return to her workplace.  For the reasons that follow, I will grant defendant's Motion (ECF 44).

### Factual Background

### A.  Hart's Experience at the Fairfax, Virginia IRS Office

Hart began her employment with the IRS in April 2006 as a Revenue Agent, located at a "duty station" in Fairfax, Virginia.  Pl. Ex. 1 (Notification of Personnel Action); ECF 44-3, Hart Depo. at 20:23-21:2.  Throughout this period, Hart was still presenting as a male, with the first name of Stuart.  Accordingly, in relevant documents, Hart is consistently referred to as a male.  To avoid confusion, I will do the same.

According to Hart: "The function of an IRS revenue agent is to conduct field office and correspondence examinations of individual and business tax returns."  Hart Depo. 21:5-7.  It appears that Hart went to work each day at the Fairfax office for the first year of his employment and then, in April 2007, enrolled in the IRS's work-from-home program, known as "Flexiplace."  Pl. Ex. 128 at 1 (Hart email requesting enrollment); Pl. Ex. 128 at 4-5 (Flexiplace agreement, signed April 20, 2007).

During the year that Hart worked at the Fairfax office, he filed four EEO complaints with the "Treasury Complaint Center."  Pl. Ex. 3, 6, 9, 13.  And, as a union member, *see*, *e.g.*, Hart Depo. 74:1-6, he filed one grievance under an applicable collective bargaining agreement.  Pl. Ex. 14.

Hart's first EEO complaint, filed in July 2006, alleged discrimination on the basis of race and sexual orientation. Pl. Ex. 3. (EEO Counseling Report-Individual Complaint). It stated, *id*.:

> The aggrieved party stated that on 6/09/06, his on the job supervisor (OJI), who is a white male, approached him stating that his attire of jeans and shirt was not appropriate for the office and was unprofessional. The aggrieved has a thin posture. The aggrieved stated that the OJI continued to discuss his attire with him as well as others in the office and eventually to his new manager, a black female. The aggrieved stated that the OJI also reminded him that he was still a probationary employee, and should watch the way he conducted himself and his attire or risk being terminated at any time. He further stated that he subsequently met with his new manager on 6/23/06, to receive his critical job elements and during the discussion, she complimented his intelligence, but discussed the need for improvement in his interactions with others as well as his inappropriate attire on 06/09/06. The aggrieved believes that the behavior of his OJI is based on his perception of the aggrieved's sexual orientation, and that his manager's comments are discriminatory based on his race (white). The aggrieved currently has an Equal Employment (EEO) investigation in his former agency based on race (white).

Hart withdrew this complaint, Pl. Ex. 4, but filed his second EEO complaint the next month, in August 2006. Pl. Ex. 6 (counseling report). He re-alleged the above, but added "retaliation" as an additional basis for discrimination. *Id*. Hart alleged that he was "being targeted for poor work performance in retaliation for his claims" because he received "negative case review evaluations from his now former OJI [*i.e.* "on the job supervisor"], which [Hart] believes was retaliatory in nature." *Id*. Hart and the IRS reached a "Resolution Agreement" on September 15, 2006, settling the claims in his second complaint. Pl. Ex. 8. Among other things, Hart's supervisor agreed to meet with Hart at the beginning of each month, for six months, to "address any issues or concerns the Aggrieved or Management may have," to maintain an "open door policy," and to revise the "written reviews of his two training cases." *Id*. at 1. Neither party admitted to any "wrongdoing," however. *Id*.

On November 8, 2006, Hart filed his third EEO complaint, alleging that "he was discriminated against on the basis of race (White) when … his former OJI, who was the subject of the aggrieved's previous complaint, had been reassigned to his [work] group." Pl. Ex. 9. It is unclear what became of this complaint.

Hart's "Group Manager," Mary E. Jones, issued a Memo to Hart on November 21, 2006, memorializing a "discussion on October 18, 2006, regarding a coworker's concern with [Hart's] actions when [Hart] see[s] [the coworker] in the hallway." Pl. Ex. 10 (Memo). Jones stated: "You have acknowledged that you have been making an obvious display of walking the other way to avoid him. You are reminded that as an employee of the Service, you are expected to act in a professional manner while conducting the business needs of the office. Demonstrative efforts on your part to avoid occasional interactions with others is not acting in a professional nor courteous manner." *Id.*[4]

On February 12, 2007, Jones issued another Memo to Hart, memorializing a "discussion on January 18, 2007, regarding a concern with [Hart's] actions in a November 17, 2006 training workshop, that were disruptive to the presentation." Pl. Ex. 12 (Memo). Jones stated: "You asked questions and then argued with the instructor with whatever answer you were given. … Disrupting the flow of the training session because you disagree with an answer is not acting in a professional nor courteous manner." *Id.*[5]

---

[4] The colleague Hart was avoiding was the same OJI who was the subject of three of Hart's EEO complaints. Pl. Ex. 20 at 1, 40, 42 (Unsworn Declaration of Hart, included in investigative file pertaining to Hart's fourth complaint, compiled by the Treasury)

[5] The colleague who brought the issue to Jones's attention was Kimberly Donnelly, Pl. Ex. 20 at 42, who was supervised at all relevant times by Steve Hansen. Pl. Ex. 20 at 6. Hansen became Hart's "first-line" supervisor in Baltimore. *E.g.*, ECF 1 ¶ 53.

Hart filed his fourth EEO complaint on February 22, 2007, alleging "discrimination based on Retaliation/Reprisal for his prior participation in the EEO process … , when on February 12, 2007, management issued a 2nd Counseling Memorandum alleging Poor Workplace Interaction." Pl. Ex. 13 (counseling report).   The IRS conducted an investigation of Hart's allegations in the fourth complaint.   *See* Pl. Ex. 20 at 1-82 (Investigative File for TD Case #EEODFS-07-0336, including five declarations from parties involved).   Hart was represented by an attorney, Robert P. Waldeck, Esq., for at least part of the process.   *See*, *e.g.*, Pl. Ex. 19 (letter from Treasury to Waldeck).   In February 2008, Hart's attorney sent a letter formally withdrawing Hart's fourth complaint.   Pl. Ex. 22 at 3 (letter); Pl. Ex. 22 at 4 (letter from Treasury confirming withdrawal).

On April 17, 2007, Hart filed a grievance under the collective bargaining agreement, in relation to a "furniture renovation project in the Fairfax office."   Pl. Ex. 14 (grievance and emails between Hart, Jones, and union representatives).   The grievance alleged that IRS management assigned Hart the wrong seniority date in the new seating selection process.   *Id.*   Management agreed to revise the seating process with Hart's corrected seniority date.   *Id.*

Hart entered into a work-from-home, "Flexiplace" agreement soon after.   The Flexiplace agreement established a work schedule of 8 a.m. to 4:30 p.m., Monday through Friday, and set a number of conditions as to the agreement.   Pl. Ex. 128 at 4 (agreement).   The conditions included, *inter alia*, that the "employee and the supervisor must certify the time and attendance worked," *id.*; that the employee "agrees to follow established procedures for requesting and obtaining approval of leave"; the employee would only work "credit or compensatory hours when pre-approved by supervisor"; the employee would "perform only official duties during

authorized work hours"; and the employee would "establish/maintain communications (or links) that ensure availability to interface with his/her supervisor or official duty station." *Id.* at 5.

Apparently, Hart began working from home in late April or early May of 2007. Thereafter, Hart did not file any formal EEO complaints for about three years, although he continued to file grievances under the collective bargaining agreement.

In June 2007, Hart submitted a grievance to Jones, stating that he had "not received proper consideration for his annual appraisal … ." Pl. Ex. 16 at 1 (grievance). The IRS determined that the performance evaluation "accurately appraises his performance during the rating period … ," and instructed Jones to issue Hart a written narrative appraisal, *id.* at 7 (response), in addition to the standard-form appraisal sheet that Jones had already issued. *See* Pl. Ex. 13 (evaluation).

In May 2008, Hart filed a grievance charging a manager with "[o]bstructive influence or recommendations injuring his opportunities with regard to personnel actions and due considerations of promotion." Pl. Ex. 23 at 2 (grievance). The IRS denied the grievance, finding that Hart "presented no evidence" that the manager "made disparaging statements … which violated the grievant's right to confidentiality and which caused the grievant to be nonselected for the positions for which he interviewed." Pl. Ex. 23 at 5 (response).

In early 2009, Hart "started Hormone Replacement Therapy ("HRT") to begin" his "male-to-female gender transition." ECF 1 ¶ 43. In March 2009, Hart legally changed his first name from Stuart to Sydney. *Id.* ¶ 44; Pl. Ex. 25 (Notification of Personnel Action). Hart alleges that sometime that month, he "informed [his supervisor] Jones that HRT may cause Plaintiff to experience hot flashes, mood swings, and emotional lability." ECF 1 ¶ 45. He

"requested a copy of the women's bathroom key to ensure" his "safety while using restroom facilities at the Fairfax" office.  *Id*.  According to Hart, Jones and Peter Hendricks, his "second-line" supervisor in Fairfax, Hart Depo. 28:23-25, denied his request for access.  ECF 1 ¶ 45.

On April 1, 2009, Hart began to report to the Fairfax office dressed as a female.  *Id*. ¶ 46. Therefore, the documents begin to refer to Hart as a female.  I shall do the same.

From an email chain submitted by Hart, it appears that on April 2, 2009, Hart met to discuss the restroom issue with Sarah H. Wilson, an "EEO and Diversity Complaints Territory Manager" for "Territory 13" (which includes ten states and the District of Columbia).  Pl. Ex. 25 at 5.  On April 15, 2009, Hart emailed Wilson to say that she had given her men's restroom key to Jones, and that Wilson would not "need to come back on April 24, 2009."  *Id*. at 4.  Wilson responded that she would provide Hart with "a response" as soon as she got one from General Legal Services ("GLS").  *Id*.  On April 16, 2009, Hart emailed Wilson again to ask for a response.  Hart stated, *id*.:  "I proposed a reasonable solution to this matter, and I fail to see why I am getting resistance.  Rumors among female employees that a 'male' is using the ladies restroom and other sexual stereotypes do not cut it, legally or otherwise.  I am always willing to be reasonable.  It is up to the agency to respond in kind."

Wilson responded, *id*.:

Sydney,

I clearly understand your frustration regarding this issue.  When we discussed this matter, I gave you an estimate of when I expected General Legal Services (GLS) to give me a response.  Based on the attorney's research the initial response is the same as the EAP Counselor; i.e., you are required to use the restroom based on your genitalia.  The attorney wanted to conduct additional research.  I concurred with him because it is very important that the agency makes the most informed decision.  This decision will not only impact you but other employees in the Post of Duty.

> Based on our discussions you work flexihours and generally come into the office
> after hours.  Since you are not currently working in the office I would recommend
> that you are patient and let the attorneys provide a final decision.  I will follow-up
> with GLS today.  I will reiterate that you will be in the office on Friday, April 24
> for a staff meeting and you will need to know what restroom to use at that time.

On July 1, 2009, while the restroom key issue remained outstanding, Hart was given a "Letter of Admonishment" ("LOA"), a form of discipline, from Hendricks, for unprofessional conduct.  *See* Pl. Ex. 26 at 1-3 (emails arranging meeting); *id.* at 4 (LOA).  The LOA said, in part, *id.* at 4:

> This is a letter of admonishment for your discourteous and unprofessional
> behavior toward a fellow employee.  Specifically, on June 12, 2009, you sent an
> email to a fellow employee in which you stated "By the way, since you are
> leaving, I find you to be a thoroughly repulsive person.  Good luck!"  The
> employee to whom you sent this email found it to be offensive and in fact a
> reasonable person would consider your remarks to be rude and abusive.  You also
> sent several other emails to your Group Manager and your fellow employees on
> that day that were disrespectful and unprofessional in tone.
>
> *                    *                    *
>
> If you engage in any future misconduct, consideration will be given to this action,
> if it is a matter of record.  Future discipline could be severe.

Hart submitted a grievance to Hendricks on July 6, 2009, stating that she (Hart) had "erroneously received an admonishment for allegedly disrespectful and unprofessional behavior on a memorandum dated July 1, 2009."  Pl. Ex. 26 at 6 (grievance).  As discussed, *infra*, Hart and the IRS did not resolve the grievance until February 2010.  *See* Pl. Ex. 26 at 8 (letter denying grievance).

Meanwhile, it appears that sometime before July 10, 2009, Hart applied for a promotion: In her Complaint, Hart alleged that "[o]n or about July 10, 2009," she "learned that she had been promoted to a Grade 12/13 Offshore Agent at the Baltimore, MD [office]."  ECF 1 ¶ 51.  On July

15, 2009, Hart emailed Jones to ask when she would hear about her start date.  Pl. Ex. 27 at 3.  In response, Jones said she would relay Hart's start date as soon as she knew it.  *Id.* at 2.  Jones also stated that she would provide Hart with a key to the women's restroom.  *Id.*  A "Notification of Personnel Action," approved on July 21, 2009, indicates that Hart's promotion was effective July 19, 2009.  Pl. Ex. 29.  In an email to a union representative, Hart said that restroom keys would not be an issue in Baltimore because all the bathrooms "are fully accessible and keys are not required."  Pl. Ex. 27 at 2.

Jones completed a performance evaluation for Hart upon Hart's departure.  Pl. Ex. 28 (evaluation).  The evaluation consisted of a standard form listing five "Critical Job Elements" ("CJE's") and fifteen "Performance Aspects" related to the CJE's, an "overall rating," and a narrative summary.  *Id.*  The "overall rating" provided six options:  "Outstanding," "Exceeds Fully Successful," "Fully Successful," "Minimally Successful," "Unacceptable," and "Not Ratable."  *Id.*  Hart was rated "Exceeds Fully Successful."  *Id.*

**B. Hart's Experience at the Baltimore, Maryland IRS Office**

Hart began working from the Baltimore duty station on August 3, 2009.  *E.g.*, ECF 1 ¶ 53.  Steve Hansen, also stationed in Baltimore, became Hart's new "first-line" supervisor.  Hart Depo. 21:21-25-22:1-4; ECF 1 ¶ 53.  Barbara Tobias, who was stationed "at the Jacksonville, FL POD[6] office," ECF 1 ¶ 53, became Hart's "second-line" supervisor.  *Id.*, *see also* Hart Depo. 21:21-25-22:1-4.

Also on August 3, 2009, Hart completed a new Flexiplace agreement, signed by Hart and Hansen, with the same schedule and conditions as in the first agreement.  Pl. Ex. 30 (agreement).

---

[6] IRS employees frequently refer to particular offices as "Posts of Duty" or "PODs" for short.  *See*, *e.g.*, Pl. Ex. 96 (email).

It appears that, at all relevant times, Hart continued to live in Alexandria, Virginia.  *See*, *e.g*., Pl. Ex. 143 at 45 (Hart email dated Dec. 5, 2010).

In her Complaint, Hart states that she worked from home from August 4, 2009, until August 24, 2009, and that from August 24 until August 28, she attended a training class in Denver with "half of her workgroup, including Hansen."  ECF 1 ¶¶ 56-57.  From September 1, 2009 through September 3, 2009, Hart's entire workgroup, including Hansen attended a workshop in Washington, D.C.  *Id*. ¶¶ 57-58.  In an email to a union representative on September 8, 2009, Hart alleged that she had been "ridiculed" on an "almost daily basis" during the meetings.  She stated, Pl. Ex. 33 at 2:

> During the past two weeks, I attended a training class and workshop with my new group.  During the past two weeks, on an almost daily basis, members of my group ridiculed me, grimaced and laughed at my appearance, balked at my use of the ladies restroom, and made me feel uncomfortable and out of place.

Hart listed the members of her group, a total of thirteen names, all but two of whom were identified as posted outside of Baltimore.  *Id*.  One of the names is Kim Donnelly, "in Fairfax, VA."  *Id*.  Donnelly had reported to Mary Jones, Hart's supervisor in Fairfax, that Hart was disrupting staff meetings, Pl. Ex. 12 at 2 (communication from Donnelly to Jones), which Jones memorialized in a memo to Hart in 2006.  Pl. Ex. 12 at 1 (memo).  Hart requested the union's help in arranging "sensitivity training."  Pl. Ex. 33 at 2.

The union representative responded to Hart's email the same day, indicating that "Traci Lillard … of EEO," presumably an IRS employee, "stated that a Diversity Specialist could prepare a presentation for the group."  Pl. Ex. 33 at 1.  Hart responded with an additional allegation against Hansen, and a note that she would file a grievance if Hansen "declines the EEO presentation."  *Id.*  Hart stated, *id*.:

> [W]ith regard to the events that I have described, Mr. Hansen was part of the problem, which was why I did not see him first.  For example, on Tuesday, September 1, 2009, at 500 N. Capitol Street, Washington, DC, Mr. Harrington [another group member] and I were standing together in the 2nd floor hallway.  As we were waiting to get into the conference room, Mr. Hansen, came along and said 'Good Morning' to Mr. Harrington and ignored me entirely.  During the August 24-28, 2009 training class in Denver and the September 1-3, 2009 Washington, DC workshop, Mr. Hansen set a tone for the rest of the group that triggered my request for sensitivity training.  On September 1, 2009, another manager, Mr. Eugene Buchs, advised Mr. Hansen "Don't even go near there" with respect to my appearance and dress.

On September 28, 2009, Hart sent an email to Nicole Oke, who presumably handles EEO complaints within the IRS, relating the incidents Hart described in her email to the union, and adding an incident that occurred on September 9, 2009.  Pl. Ex. 33 at 7.  Hart stated, *id.*:

> 9. On Wednesday, September 9, 2009, I stopped off at the Baltimore office … .  At approximately noon, Mr. Hansen and I were in his office.  Nobody else was present, but his door was open.  Mr Hansen made these statements (including but not limited) to me:
>   a. "I am the one who should receive sensitivity training."
>   b. "My skirts are too short."
>   c. He is angry that "I am going around his back to the union before seeing him first."
>   d. He learned through Ms. Kim Donnelly that I filed "too many EEO complaints at Fairfax to the point that the EEO office no longer takes me seriously."
>   e. He resented the fact that I may file an EEO complaint if he leers or stares at me the wrong way.

> 10. On [that day], Mr. Hansen's tone was hostile and disrespectful to me, even though he was aware that I was scheduled for surgery on September 10, 2009.  Mr. Hansen did not deny snubbing me on September 1, 2009 in Washington DC, by saying that "if he ignored me."

Hart alleged that there was a "spillover effect from Fairfax" and that she was being subjected to "disparate treatment based on retaliation and gender."  *Id.*  Oke responded that she would have "a counselor" contact Hart.  *Id.* at 6.

- 12 -

The Court is unaware of any other evidence in the record concerning the ridicule Hart allegedly suffered during these September 2009 meetings.

On October 20, 2009, Hansen sent Hart an email asking if she was available to attend trainings in Philadelphia in early December.  Pl. Ex. 35 at 2-3.  Hansen added that he recalled that Hart "plan[ned] to be on medical leave," and said, "if that is the case," Hart needed to provide a doctor's note indicating the dates she would be out of work and whether there would be any "restrictions on [Hart's] job related duties" upon return, "such as driving, overnight travel, etc."  *Id.*  This resulted in an email exchange over two days' time, in which Hart asserted that she was not required to submit any medical information to Hansen under the applicable collective bargaining agreement, indicated that Hansen's request was "inappropriate," and "remind[ed]" Hansen to "treat [Hart] in a ladylike and professional manner at all times."  *Id.* at 2. She also pointed out that Hansen did not request documentation for eleven consecutive days of sick leave Hart took in September 2009.  *Id.*  Hansen refuted Hart's contract-based arguments, noted that his earlier failure to request a medical certification was "an oversight," and agreed that Hart could instead submit the information to a "medical professional" at "Federal Occupational Health … ."  *Id.* at 1-2.

The next day, October 21, 2009, Hart created an "updated" version of the "statement" she had sent to Oke on September 28, and emailed this version to Keisha Clark-Proctor, an "EEO Specialist," who is presumably the "counselor" to whom Oke referred Hart.  Pl. Ex. 38 (emails). Hart added a summary of her dispute with Hansen about Hart's leave documentation.  *Id.* at 4. In response, Clark-Proctor stated that, under the collective bargaining agreement, "management has the right to require that [Hart] provide medical documentation for any absence of 3 days or

more," and that Clark-Proctor did not know "if this is something they do with everyone or not." *Id*. at 1.  She also told Hart that "management in [her] organization" had agreed to receive a "presentation" from "EEO," presumably the sensitivity training.  *Id*.  As discussed, *infra*, the presentation did not take place until October 2010.

On December 17, 2009, Hansen emailed Hart about a number of work-related matters. Pl. Ex. 39 at 1-2.  Of relevance here, he told Hart that, pursuant to the collective bargaining agreement, her Flexiplace agreement required her to "report to … her assigned POD at least 2 days each pay period," and he stated that Federal Occupational Health "had not received any information" on Hart's sick leave.  *Id*. at 2.  Hart responded that she would "start showing up after the holidays, when [she would be] in better physical shape."  *Id*. at 2.  She also stated that her doctor had sent the information "on or about October 27, 2009," *id*., and forwarded a "copy of the letter that [her] doctor sent the IRS Doctor."  *Id*. at 4.  The letter, addressed to Federal Occupational Health and dated October 27, 2009, stated:  "[Hart] is scheduled for surgery on November 3, 2009 and will not be able to return to work for at least four to six weeks. Depending on her recuperative progress, [Hart] may be required to return to work with restrictions.  She will not be permitted to travel for work if such travel involves flying until January, 2010."  *Id*. at 5.

In her Complaint, Hart states she met with Hansen for a workload review on January 12, 2010, and was "issued a letter … charging Plaintiff with insubordination because Plaintiff had failed to meet with Hansen for a workload review before Plaintiff's sex change surgery."  ECF 1 ¶ 75.  She adds: "On February 25, 2010, on the advice of her union representatives, Plaintiff agreed to accept [an] alternative form of discipline by donating twenty-four (24) hours of annual

leave to the IRS Annual Leave Bank." *Id.* ¶ 77.   Hart submitted a copy of the "Alternative Discipline Agreement."   Pl. Ex. 43.   It provides that Hart "agrees she did fail to follow a management directive when she refused to report to the office for a workload review as directed by her Group Manager." *Id.*   It does not otherwise clarify when or why this happened.[7]

In a Memorandum of February 26, 2010, from Barbara Tobias, Hart's second-line supervisor, to a union official, Tobias denied Hart's grievance of July 6, 2009, relating to the "Letter of Admonishment" Hart had received for inappropriate emails, *supra*.   Pl. Ex. 43 A at 1-2.   Tobias noted the grievance was discussed in a telephone conference on February 4, 2010, in which Hart, Tobias, a union official, and Philip Wilcox, a "Labor Relations Specialist," participated. *Id.* at 1.

Tobias recounted that the union official, Richard Sallstrom, believed "personality problems" between Hart and a fellow employee was a "mitigating factor" that should have been considered with respect to Hart's email to the fellow employee, characterizing that employee as a "thoroughly repulsive person." *Id.*   Tobias disagreed, stating, *id.*:

> I have reviewed the facts in this case and have considered the arguments you made at our meeting.   I have determined the following.   I find that the email which the grievant sent to a fellow employee referring to her as 'a thoroughly repulsive person' was language that 'a reasonable person would consider being rude, abusive or discourteous … .

---

[7] A later email from Hart to Tobias and others, dated September 2, 2010, indicated that Hart believed Hansen unfairly "ordered" her "to report to the office for a full-blown Workload Review as [she] was preparing for gender reassignment surgery that [she] knew would result in a long and difficult recovery."  Pl. Ex. 62.

In addition, Tobias cited other unprofessional emails. *Id*. at 1-2. And, she noted that "per the IRS Guide to Policy Determinations," the offense warranted a penalty "ranging from an admonishment to one (1) day suspension." *Id*. at 1.

On April 16, 2010, Hansen issued a performance evaluation to Hart, using the same form Jones had used, as described earlier, and with a lengthy narrative summary. Pl. Ex. 44 (evaluation). Hansen gave Hart an overall rating of "Fully Successful." This rating was one step down from Hart's prior evaluation, issued by Jones in July 2009, of "Exceeds Fully Successful." *See* Pl. Ex. 28 (evaluation). Hansen stated, in part: "[S]everal instances were noted where you were disrespectful to another employee and the manager and you need to ensure you treat all individuals with respect and in a professional manner." *Id*. at 4. No specific examples were given, however. *Id*. The summary also stated that Hart "need[ed] to improve on reducing the time charged to [her] cases," and gave several specific examples. *Id*. at 6. The summary repeatedly stated that Hart was "generally" doing well in each category that was addressed: "Customer Satisfaction- Application"; "Business Results – Quality"; "Business Results – Efficiency."

On May 17, 2010, Hart emailed Louis Liotine, Pl. Ex. 49 (email), the "Acting Territory Manager" for "International Compliance Strategy & Policy - Territory 1." *See* Pl. Ex. 45 at 2 (email). The email of May 17, 2010, indicated that Hart met Liotine at a conference in Chicago, *id.*, but it is not otherwise clear why Hart reached out to Liotine. In the email, Hart related that, because of her "Group Manager's incessant animosity and resentment toward" Hart (presumably referring to Hansen), she "chose not to pursue any grievances," because she "didn't care anymore." Pl. Ex. 49. Hart concluded: "I have been unable to determine the best time to resign,

- 16 -

so I would rather have the Agency make that decision for me.  In my last email to you, I stated

that I 'want' something.  I want to be fired!"  *Id.*

On May 21, 2010, Hart filed her fifth EEO complaint, alleging sex-based discrimination

in relation to her evaluation of April 16, 2010.  Pl. Ex. 46 at 2 (counseling report).  She stated, *id.*

at 3:

> The Aggrieved stated she was once a male and that Management is aware.  The
> Aggrieved stated that in the past Management allegedly made comments about
> her attire stating her dresses were too short. The Aggrieved further stated
> Management allegedly made comments about her prior EEO activities and that he
> is afraid to say something to her or look at her in a way she might file a sexual
> harassment complaint.
>
> The Aggrieved stated as a male her evaluation was rated high but as a female she
> is being rated lower.  The Aggrieved stated she never received a mid-year review
> and was given only one workload review in January, 2010 which was too late to
> improve by the time she received her evaluation.

As a remedy, Hart requested "Sensitivity Training for her group on Transgender people."

*Id.*

Hart emailed Liotine again on June 17, 2010, stating:  "Good Morning!  My request

below, that I want to be fired, is still in effect … ."  Pl. Ex. 49.

On June 24, 2010, Hansen forwarded, via email, a "Leaders's Alert" from "IRS

Communications," to eleven people, including Hart, who all appear to be members of Hart's

workgroup, under Hansen's supervision.  *See* Pl. Ex. 50 at 1; Pl. Ex. 32 at 2 (workgroup list).

Referring to an item note in the Leader's Alert, someone in the email chain, presumably one of

Hansen's supervisors, stated:  "It has come to my attention that we are not always adhering to the

[Flexiplace] requirement of employees coming to the office twice per period … ."  Pl. Ex. 50 at

1.

An incident occurred in the Baltimore office on June 29, 2010, between Hart and Robert

Curry, the "Group Secretary" for Hart's workgroup.  *E.g.*, ECF 1 ¶ 82.  The first reference to this

incident that the Court located in the record is an email from Hart to Curry dated June 29, 2010.

Pl. Ex. 51 at 1.  Hart stated, *id.*:

> Good Afternoon!
>
> I don't intend to say anything about what happened today.
> You may think that Mr. Hansen is the "best manager in the whole of the IRS,"
> but, in my opinion, he has been awful.
> Just remember one thing.  I am more man than you will ever be.

Curry replied: "Oh Okay."  *Id.*  Minutes later, Hart responded that she has "a lot of

respect for Marines, including former Marines."  She wished Curry "a restful July 4th," to which

he answered, "You also!"  *Id.*

At 7:32 a.m. on June 30, 2010, Hansen sent Hart an email stating, in part, Pl. Ex. 52 at 1:

"Sydney, Re the O'Hare case you took out of my office yesterday, don't ever take anything out

of my office again."  He also criticized Hart's case analysis and instructed her that "in any future

case in which you plan to issue a 30 day letter," she should send it to him (Hansen), and he

would be "signing the 30 day letter and mailing the RAR."  *Id.*  At 7:38 a.m., Hart responded to

Hansen, stating that the "group secretary gave [her] the case file," and that she would continue to

"issue the RAR, as [she has] been doing for the last 4+ years."  *Id.*  She added:  "If you are

dissatisfied with the work that I am doing, I will be more than happy to return my current cases."

*Id.*  At 7:40 a.m., Hart forwarded the chain to Tobias, stating only:  "Good Morning!  Please see

below.  I wish to be fired.  Sydney."  *Id.*

Two minutes later, at 7:42 a.m., Hart emailed Tobias again, this time to tell her about the

June 29, 2010 incident with Curry.  Pl. Ex. 53.  Hart stated, in part, *id.*:

> At approximately noon yesterday, I witnessed Group Secretary Robert Curry tell a co-worker, Michelle, that "even though I [*i.e.*, Hart] have the best manager in the whole of the IRS, all I do is file grievances."  A few minutes later, I approached Mr. Curry at his work station to discuss this matter.  Mr. Curry acknowledged that he did make the statement to Michelle.  I told Mr. Curry that his comment to Michelle was inappropriate, and that he should have exercised better judgment.  I told Mr. Curry that even though he has had a positive experience with Mr. Hansen, I cannot say the same, especially in light of the comments that Mr. Hansen had made to me prior to my surgeries last year.  Mr. Curry then told me that "I need to learn how to get along with others" and that "I should get back to work."

She concluded:  "This is further proof that Mr. Hansen and Mr. Curry are incapable of acting like gentlemen towards me, which is why I have repeatedly asked to be fired."  *Id.*

At 7:59 a.m., Hart emailed Hansen the following:  "Good Morning! As a female, I find that you are too abrasive and abusive with me.  I will not be meeting with you for any more reviews."  Pl. Ex. 54.  At 8:10 a.m., Hart sent Tobias and Hansen an email with the subject line "My Holiday Plans," informing them that she had obtained a New York "CPA license" and would be going "to New York this weekend to set up [her] private practice."  Pl. Ex. at 55 at 1.  Further email exchanges with both managers appear to have ended with Hart telling Tobias that "Mr. Hansen doesn't understand that I want to leave the IRS so I can become self-employee [sic] and not work as an employee ever again. ????," *id.* at 1, and telling Hansen:  "You don't seem to understand.  I want to leave the IRS to get away from managers like you, Barbara Tobias, and Peter Hendricks."  *Id.* at 2.

Three days later, on July 2, 2010, Hart emailed Tobias again, with a copy to eight others (but not Hansen), explaining that "pronounced physical and biochemical (hormonal) changes" related to her gender transition "caused [Hart] to become emotionally labile and to experience mood swings that are reflected in the content and tone of some of my emails."  Pl. Ex. 56.  She

restated various allegations of discrimination and concluded:  "For the first time in my eight-years as a career Federal employee, I have asked to be fired, mostly because of the actions taken by Mr. Hendricks, my current Group Manager, and you, against me."  *Id.*

On July 6, 2010, Hart again emailed Tobias about the incident with Curry on June 29, 2010.  Pl. Ex. 57.  Hart stated that, on that date, after she said hello to Curry, "he bent down over to spit something into the garbage can.  At point-blank range, he missed, then said 'It's a <u>man</u> thing' referring to his spitting into the garbage can.  Mr. Curry is fully aware that I am transsexual."  *Id.* (emphasis in original).

On July 18, 2010, Hart received a promotion, from "Grade 12" to "Grade 13," along with a corresponding salary increase.  Pl. Ex. 58 (Notice of Personnel Action).

Hart and the IRS signed a "Resolution Agreement" on July 21, 2010, resolving Hart's EEO Complaint of May 21, 2010, in relation to her April 2010 performance evaluation.  Pl. Ex. 59.  The agreement obligated "Management" to provide "Diversity Training" at a group meeting by October 15, 2010.  *Id.*  Under the agreement, Hart withdrew her grievance.  Neither side admitted any wrongdoing.  *Id.* at 1.  The Diversity Training was held on October 5, 2010.  *See* ECF 1 ¶ 94; Pl. Ex. 68 (emails and agenda).

Hart emailed Hansen on September 2, 2010, reminding him that her "mid-year review for [her] annual popularity appraisal … is due on or by Friday, October 1, 2010."  Pl. Ex. 61.  Hansen responded that if Hart wanted her mid-year appraisal by September 30, 2010, they would "need to move the W/L review we previously scheduled from 10/6/10 to the week of 9/27/10," and he asked if Hart wanted to reschedule.  *Id.*  Hart disputed the subject of the meeting

scheduled for October 6, 2010, and stated that her performance review was due October 1, 2010,

"regardless of when the next review takes place."  *Id.*

On September 7, 2010, Hansen emailed Hart her mid-year review, and asked her to "call

or stop in to discuss any issues or concerns … ."   Pl. Ex. 64 (email and evaluation).   Her

"Summary level," presumably equivalent to the "overall rating" indicator on annual reviews, was

again "Fully Successful."   *Id.* at 2.   In the lengthy narrative summary, Hansen noted that Hart's

email to Curry, in which she stated "I am more man than you will ever be," as well as "numerous

E mails to [Hart's] manager requesting to be fired," were not professional conduct.   *Id.* at 3.   He

also stated, as in Hart's previous evaluation, that she needed "to improve on reducing the time

charged to [her] cases," citing specific examples.   *Id.* at 5.   But, as before, he repeatedly stated

that Hart was "generally" doing well in all aspects considered.

On September 22, 2010, Hart filed her sixth EEO complaint, alleging discrimination on

the basis of sex as well as retaliation with respect to her mid-year evaluation.   Pl. Ex. 65

(counseling report).   She noted that her score was the same as her last evaluation, and stated,

*inter alia*:   "The Aggrieved stated she feels her Manager is purposely holding her back, not

giving her the recognition she deserves which is why she believes her performance is stagnant."

*Id.* at 3.   She also claimed the Appraisal "contains several inaccuracies."   *Id.*   Hart added that she

"has a medical condition that is the result of hormone imbalance accompanied by mood swings

and hot flashes due to gender transition," but that she "does not need Reasonable

Accommodation."   *Id.*   She forwarded the complaint to four other IRS officials, *see* ECF 1 ¶ 90

(identifying officials), explaining that "perverted and out-of-touch management … breeds

ignorance and intolerance" and "causes personnel disputes."   Pl. Ex. 65 at 1 (email).

Hart emailed Tobias and other IRS officials on September 24, 2010, alleging that Hansen had "singled out one of the female agents" in a group conference call "by asking her whether she had submitted her timesheet to the Group Secretary in a timely fashion." Pl. Ex. 66 (email).

### C. Events Undergirding IRS's Proffered Reasons for Termination

As discussed, *infra*, Hart's termination did not become effective until May 20, 2011. But, the reasons advanced by IRS for Hart's termination date back to October 6, 2009. Pl. Ex. 111 ("Removal Proposal").

As an initial matter, I note that plaintiff has not provided the Court with any testimony or statements, such as depositions and affidavits. But, she has provided numerous emails, as well as the investigative file (Pl. Ex. 126, "CRD File") resulting from the Treasury's internal investigation of the EEO complaint, *see* Pl. Ex. 124, that Hart filed in May 2011, after her termination became effective. The CRD File appears to have been compiled by employees of the Civil Rights and Diversity Office of the Treasury ("CRD"), documenting an investigation conducted between June 2011 and April 2012. *See* Pl. Ex. 126 at 10 (end of final report, dated April, 2012). Notably, the CRD File contains "Declaration Questions," which were signed under penalty of perjury, from the following persons: Hart; Hansen; Tobias; Pamela Drenthe; Rosemary Sereti; and David Gonzales. *Id*. at 11-58. As of October 2010, Drenthe was Hart's third-line supervisor, Hart Depo. 22:19-25-23:1; Sereti was Hart's fourth-line supervisor, *id*. at 22:14-22; and Gonzales was a "Labor Relations Specialist." *See id*. at 47:9-10; *see also* Pl. Ex. 124 at 3 (Final EEO Decision, summarizing titles).

On October 6, 2010, Hart went to the Baltimore office for a scheduled meeting with Hansen. By all accounts, it did not go well. The CRD File contains two sets of "Declaration

Questions" signed by Hart—one on January 13, 2012 ("First Declaration") and the other on January 18, 2012 ("Second Declaration").  In her First Declaration, Hart provided the following account of the October 6 meeting, Pl. Ex. 126 at 13-14:

> Hansen criticized Complainant's skirt length on September 9, 2009 and October 6, 2010. … It is inappropriate for a manager to make sexist and discriminatory remarks about an employee's workplace attire.  Managers should not leer and stare at employees.  Complainant found this conduct offensive and unwelcome.
>
> ***
>
> Due to a pervasively hostile work environment, Complainant informed her managers that she would rather be fired than quit.  On October 6, 2010, when Hansen presented a "resign or be fired" ultimatum to the Complainant, Complainant told Hansen that she would rather be fired.
>
> ***
>
> On October 6, 2010 [concerning Hart's prior EEO activity], Hansen made these comments to Complainant:
> "You did not have the guts to see me first before going to the [union] or an EEO counselor."
> "When did you contact an EEO counselor?"
> "How long was your contact with an EEO counselor?"
> "You inappropriately charged time to cases when you were speaking to EEO counselors."
> "No wonder your time on cases is so high, because you spend so much time talking with EEO counselors."

In response to a question asking what Hansen had said concerning Hart's prior EEO activity, Hart also quoted "an email dated October 7, 2010 from Steve Hansen to Barbara Tobias," as follows, Pl. Ex. 126 at 15 (First Declaration):

> "I had spoken to the EEO person re Sydney's latest complaint (Janice Atkins) and I had asked her how long she had talked to Sydney about this complaint and she stated 45 minutes on 9/22/2010.  When I looked at Sydney's signed 4502 [timesheet] it showed 8 hours charged to 1 case.  I questioned Sydney as to why this time was charged to a case and she stated she may have talked to Janice during lunch.  I said this is an example as to why your cases have excessive time such as 40 hours to close 1 issue unreported Foreign income case (FIRP).  Sydney

- 23 -

stated she is very thorough and wants things done right and does not want her cases coming back from review or Appeals.

I then questioned Sydney re the latest EEO complaint and why she had not come to me first to discuss her issue and she stated…it took a year to get a group diversity presentation.  [Ellipses in original.]  I told her that was due in part to the manner in which she handled it by first having the Union … come into my office and state they would file a grievance if this training was not done, then going to EEO when Sydney was not happy with the Unions response."

*See also* Pl. Ex. 133 at 20-21 (email from Hansen to Tobias dated October 7, 2010).

In his own response to CRD's "Declaration Questions," Hansen stated, *inter alia*, that on October 6, 2010, Hart "came into the office in a mini skirt approximately 6 inches above her knee and she was told this is not appropriate attire for the office."  Pl. Ex. 126 at 23.  Hansen also made statements in accord with his email of October 7, 2010 (as quoted by Hart) regarding his discussion with Hart of her EEO activity.  *Id*. at 27.

In his email to Tobias on October 7, 2010—apparently the same email Hart quoted in her First Declaration—Hansen also stated, Pl. Ex. 133 at 20:

I stated this was a work load review and Sydney stated we had a 4502 review scheduled for 10/6/10 … .  Sydney also wanted to know why we could not complete the W/L review over the phone as I do for my agents in other POD's (i.e. Greenville, SC was mentioned by Sydney) and I stated for my employees PODed in Baltimore such as Dolores, they come into the office.  Sydney, stated [sic] if she stayed in Baltimore until 4:30 she would not be able to make her private appointment she had scheduled (Sydney lives in Alexandria, VA maybe 50 miles from Baltimore).  The 10/6/10 W/L review was scheduled on 7/26/10 by Sydney and myself.  I told her we need to complete the W/L today in my office or if not she would have to come back into the office soon to complete it[.]

Sydney then stated she wants to be fired and I said your wishes are very clear.  I said you want to fired [sic] so you can sue the government and that you should quit if you are unhappy.  Sydney said she is not a quitter and wants to be fired.

Hansen's email continued with text that matches the two paragraphs quoted in Hart's First Declaration, quoted *supra*.  Hansen's email then concludes as follows, *id*. at 20-21:

I then said to Sydney that the mini skirt she was wearing was not appropriated [sic] attire for the office and do you see anyone else in the office wearing mini skirts[.]

Sydney then got up and started to leave my office and I said you need to sit down and we need to do the review.  Sydney then sat back down and made references to previous allegations against me during 9/09 that she stated I had made such as reference to previous EEO and union grievances she had filed and again stated you can't reason with a fool.

Sydney then got up again and stormed out of my office at approximately 9:30 and also left the IRS office, then at 10:29 she left a VMS that she was calling in sick for the day.

In Hart's Second Declaration, in response to the question, "Did you 'storm' out of a workload review meeting on October 6, 2010 at 9:30 a.m. and fail to return to work," Hart answered, Pl. Ex. 126 at 18:

> Complainant denies that she "stormed" out of a workload review meeting …. Hansen's line of questioning, tone, body language, and facial expression made Complainant afraid and fearful … . [Hansen] asked "why don't you just resign?" Complainant told Hansen that she was not feeling well, and Complainant left the office peacefully and quietly.  At approximately 10:30 AM, Complainant left a voicemail message with Hansen, calling in sick.

That same day, Hansen "sent an AWOL [i.e., Absent Without Leave] notice via email, denying Complainant's request for sick leave … ."  *Id.  See also* Pl. Ex. 70 at 1-2 (AWOL notices).  In an email to Hart, Hansen directed Hart to come to his office for a workload review at 8:30 a.m. on October 14, 2010.  Pl. Ex. 76 at 1 (email).  In his email, Hansen also wrote:  "If you fail to report it will be considered a failure to follow a management directive and could result in disciplinary and or an adverse action."  *Id*.

At 3:58 p.m. that day, Hart emailed Janice Aikens, an EEO Counselor, *see* Pl. Ex. 74 at 1, with Tobias and Sereti copied on the email.  Pl. Ex. 73 (email).  Hart stated:  "I wish to negotiate a mutually acceptable date for my resignation to settle and withdraw any outstanding complaints.

I further stipulate that I shall no longer be reporting to the Baltimore POD so long as that manager is there. When I left yesterday, I left for good and I will not be coming back." *Id.*

On October 14, 2010, Hart did not appear at the Baltimore office for her workload review with Hansen. Hart Depo. 58:12-17. Via email that same day, Hansen indicated that Hart did not report for the workload review and again directed Hart to report for a workload review, this time on October 19, 2010, at 8:30 a.m. Pl. Ex. 76 at 1 (email). He repeated his warning that failure to attend could result in discipline. *Id.* In response, Hart forwarded Hansen's email to, *inter alia,* Tobias, but not Hansen, and stated: "I did not receive Mr. Hansen's Wednesday, October 6, 2010 e-mail to me. I receive many e-mails on a daily basis, and it is very easy for me to overlook an e-mail." *Id.*

That same day, Hart digitally signed a resolution agreement with Tobias, resolving Hart's EEO Complaint of September 22, 2010, in relation to Hansen's mid-year performance evaluation of Hart. Pl. Ex. 75 (agreement). The parties agreed to create a "Career Learning Plan" by December 15, 2010. *Id.*[8]

---

[8] Hart submitted numerous documents relating to the Career Learning Plan, which was never created. I need not describe them here because, as Hart indicated in December 2012, the point is "moot." Pl. Ex. 143 at 39 (email exchange between Hart and union representative).

I also note that, on the evening of October 14, 2010, Hart sent an email to, *inter alia,* Tobias, Aikens, and Sereti. Pl. Ex. 78 at 1 (email). She forwarded to them Hansen's emails directing her to report for a workload review and stated: "This is to let you know that through the Virginia Department of Criminal Justice, I am an armed private investigator who is awaiting personal protection specialist and security officer arrest authority status." *Id.* Upon receiving the email, Sereti reported it as a "possible threatening statement" to the hotline of the Treasury's Inspector General for Tax Administration ("TIGTA"), which resulted in a TIGTA investigation of the matter. *See* Pl. Ex. 133 at 4 (summary of Sereti statement to TIGTA investigators). On October 19, 2010, Hart also emailed a colleague stating: "I have a confession to make. You are very pretty. I'm sorry that we had to meet under these circumstances." Pl. Ex. 133 at 9 (email). This became a part of TIGTA's investigation as well. *Id.* at 7 (TIGTA memo).

On October 19, 2010, Hart again did not appear at the Baltimore office for her workload review. Hart Depo. 60:25-61:1-4. Hart emailed Hansen at 6:29 that morning to say that she was "unable to meet with" Hansen because she was not "feeling [her] usual self." Pl. Ex. 79 (email). In response, Hansen asked if Hart was "requesting some type of leave." *Id*. It appears that Hart did not reply. At 12:21 p.m. that same day, Hart emailed Sereti stating, *inter alia*, "I feel harassed by IRS managers" and "I wish to be left alone so that I can be fired." Pl. Ex. 83 (email). A copy of an electronic calendar entry submitted by Hart indicates that Tobias, Hansen, and Gonzales met at 1:30 p.m. that day to talk about Hart. Pl. Ex. 90 at 2. At 1:47 p.m., Hansen sent another email to Hart directing Hart to report for 1) a workload review on October 20, 2010 and 2) on the same day, a meeting with agents from another Treasury Bureau regarding an open investigation, *see* Note 6, again with the warning of future discipline if Hart failed to report. Pl. Ex. 85 (email). At 3:03 p.m., Hart emailed Tobias, stating: "How was today's LR meeting about me? I wish that you wouldn't hide behind the front-line manager to do your 'dirty work.' If you want anyone to do your 'dirty work,' then you should have the courage to do it yourself." Pl. Ex. 88 (email).

On October 20, 2010, Hart did not appear at the Baltimore office for her workload review or for the meeting with Treasury agents. Hart Depo. 62:13-25-63:1-16. At 10:36 a.m., Hansen

---

Hart has submitted numerous exhibits relating to this investigation. Notably, Hart filed an EEO complaint, alleging discrimination based on sex and retaliation, and seeking only the name of the person who reported her and a "statement" from "that management official … reaffirming his/her commitment to EEO." Pl. Ex. 115 (counseling report). This complaint was mediated and settled in February 2011, when Sereti agreed to both of Hart's requests. Pl. Ex. 113 at 7 (settlement). The matter was not raised in Hart's termination process, *see*, *e.g.*, Pl. Ex. 111 (Removal Proposal). The TIGTA case was closed upon Hart's termination, apparently without any final decision or action on the matter. Pl. Ex. 133 at 24 (case closure).

emailed Hart two AWOL notices for October 19 and October 20, 2010.  Pl. Ex. 91 at 1 (email).

The notices stated that she failed to appear, did not request leave, and that no leave was

approved.  *Id*. at 2-3 (notices).

Hansen emailed Hart on October 21, 2010, to say that he was terminating her Flexiplace

agreement, and reciting the ways in which she had violated the agreement.  Pl. Ex. 94 (email).

He also directed Hart to report to her "official Post of Duty (Baltimore, MD) at the beginning of

[her] tour of duty Monday, October 25, 2010."  *Id*.  Hansen added:  "Please be advised that if

you fail to report, it will be considered failure to follow management directives and you will be

charged [AWOL] for every workday you fail to report to your assigned POD."  *Id*. at 2.  Hart

responded via email:  "As I have stated to Ms. Tobias yesterday, I am *fearful* of you.  Therefore,

I cannot report to the office as you have asked."  *Id*. at 1 (emphasis in email).  Hansen replied

that he would be out of the office on October 25, 2010.  *Id*.

Also on October 21, 2010, Hart forwarded the Flexiplace email to a union representative,

who advised her that Hansen's actions were in compliance with the collective bargaining

agreement, and that failure to appear would eventually result in Hart's termination.  Pl. Ex. 143

at 8 (email).  In response, Hart stated only:  "Yes, I wish to be terminated."  *Id*.

Tobias emailed Hart on October 22, 2010, to say that, to allay Hart's fear of Hansen,

Tobias would ensure another manager was present if Hart needed to meet with Hansen.  Pl. Ex.

96 (email).  Tobias reiterated Hansen's termination of Hart's Flexiplace agreement, stating:

"[P]lease be advised that you are still being directed to report to your Post of Duty at the

beginning of your tour of duty Monday, October 25, 2010."  *Id*.  Further, Tobias warned Hart

that her failure to appear "will result in discipline up to and including removal."  *Id.*

Also on October 22, 2010, Hart continued her email correspondence with a union representative, who again advised her she would be fired if she failed to report.  Pl. Ex. 143 at 7 (email).  Hart replied, *inter alia*: "My firing will be a badge of honor that I will gladly wear because I had the guts to stand up for my rights."  *Id.*

On October 23, 2010, Hart replied to Tobias's email regarding termination of Hart's Flexiplace agreement.  Pl. Ex. 96 at 1 (email).  Hart said that she could "not come off flexiplace" because Tobias's offer did "not allay [Hart's] fears" related to "chance encounters in the hallways," and because she was "still feeling the after-affects [sic] of the numerous medical and surgical procedures" she had undergone.  *Id.*

On Monday, October 25, 2010, Gonzales forwarded Hart's email of October 23 to Byron Smalley.  *See* Pl. Ex. 126 at 91 (email).  Smalley is elsewhere identified as "GLS Chief Counsel."  Pl. Ex. 126 at 55 (Gonzales Declaration in CDR File).  Gonzales asked Smalley:  "We will start chagrin [sic] her AWOL effective today until ?"  *Id.*  Smalley responded, *inter alia*, *id.*:

> Hart is refusing to come to work.  Plain and simple.  She is saying—Yes, I hear you, and No, I will not.
>
> That is the stuff of removal.  She is laying down the law—I will not come to work; I will not meet with my supervisor or with him and another supervisor; I will not even be in the same building as my supervisor.
>
> She raises medical concerns.  Well, she can present those arguments (and any med doc as evidence) at the reply stage. …

Smalley also suggested "30 days"—presumably thirty days of suspension—but asked: "[G]iven Hart's declaration of 'no' in her [email of October 23], would anything less than proposing removal simply be delaying the inevitable?"  *Id.*

Hart did not appear for work in the Baltimore office on October 25, 2010. At her deposition, Hart agreed that she did not report to her post on October 25, 2010. Hart Dep. 67:17-23. And, as far as I can tell, she never reported on any day after October 25, 2010. Hansen continued to report Hart's status as AWOL each day thereafter. *See*, *e.g.*, Pl. Ex. 122 1-14.

On November 2, 2010, Tobias emailed Gonzales asking whether the current circumstances warranted termination, rather than a 30-day suspension. Pl. Ex. 126 at 83 (email). The next day, November 3, 2010, Treasury agents picked up Hart's employer-issued office equipment and case materials at her home. Pl. Ex. 126 at 79-82 (emails); Pl. Ex. 110 (equipment release form signed by Hart). The same day, Gonzales emailed Tobias a list of factors, called "Douglas Factors," that Tobias was required to consider in making any decision to discipline, and indicated Drenthe would need to consider them as well. *See* Pl. Ex. 126 at 88 (email), 9 (list of factors). On November 5, 2010, Tobias responded to Gonzales with a recommendation for removal, indicating her reasons for the decision. Pl. Ex. 126 at 87 (email).

By letter dated November 8, 2010, Tobias issued a "notice of proposed adverse action" to Hart, indicating that Hart would be removed from service or otherwise disciplined at any time after thirty days from receipt of the notice, and detailing the reasons supporting the action. Pl. Ex. 111 ("Removal Proposal"). The Removal Proposal listed four "Reasons" for Hart's removal: 1) "You failed to follow management directives;" 2) "You exhibited unprofessional behavior;" 3) "You failed to follow appropriate leave procedures;" and 4) "You were absent without leave (AWOL)." *Id.* at 1-4. Under each Reason, Tobias listed a number of "Specifications," each one corresponding to a specific example supporting the stated Reason. *Id.* at 1-5. In sum, the Removal Proposal provided thirty-four different Specifications. The first four charge Hart with

failing to report for meetings on October 6, 14, and 19. *Id*. at 1. Only two Specifications pertain to Reason 2, unprofessional behavior. The first charged Hart with "attempting to leave a manager's office without finishing a workload review," on October 6, 2010, and stating, "You can't reason with a fool;" the second charge referred to Hart's email to Tobias of October 19, 2010, in which Hart accused Tobias of hiding behind other managers to do her "dirty work." *Id*. at 3-4. The remainder of the Specifications all related to Hart's failure to report for work in Baltimore on the work dates between and including Monday, October 25, 2010 and Friday, November 5, 2010, and/or failing to request leave for those days. *Id*. at 1-5. Tobias also stated that, "[i]n proposing this action," she had taken into consideration the Letter of Admonishment Hart received in July 2009, for unprofessional behavior, and the alternative discipline Hart received in February 2010, for failing to follow management directives. *Id*. at 6.

The letter directed Hart to contact Gonzales if she "wish[ed] the Agency to consider any medical condition which [she] believe[d] contributed to the reasons(s) for this proposed action," outlined Hart's right to written or oral reply, and stated that no decision would be taken until a reply was "received and considered," or the time to do so elapsed. *Id*. at 6-7.

The Reasons Tobias enumerated in the Removal Proposal essentially matched those included in her email to Gonzales on November 5, 2010. *See* Pl. Ex. 126 at 87 (email); Pl. Ex. 111 (Removal Proposal). The one reason that appeared in the email but not the Removal Proposal was this: "Employee has refused to report her POD and is unable to perform her job, and employee has indicated that she will not report to the POD." Pl. Ex. 126 at 87.

On March 24, 2011, Henry Powell, the union president, presented an oral reply on Hart's behalf to Tobias, Gonzales, and "Jeannie Fisher," a "Territory Manager" for "LB&I,"[9] in which Powell recounted most of the facts just discussed.  *See* Pl. Ex. 118 at 1-5 (Transcript of Oral Reply).  Powell also asked the IRS to "consider what a waste [termination] would be in view of the time and money invested in training Ms. Hart and what Ms. Hart has provided in return as experience, knowledge and dedication." *Id*. at 37.  He contended, on behalf of the union, "that removal is not the appropriate penalty," as it is "unduly harsh" in light of the fact that Hart "has been a dedicated and faithful employee of the IRS since 2006." *Id.* at 37-38.

 On April 14, 2011, Tobias emailed Drenthe and Gonzales, stating that she had reviewed the transcript from the oral reply, and recommended that the IRS issue "the final termination letter." Pl. Ex. 126 at 61 (email).  On April 28, 2011, Drenthe emailed Gonzales stating that she had reviewed the requisite factors (the "Douglas Factors," noted above), and also recommended removal.  *Id.* at 68 (email).

By letter dated May 9, 2011, Drenthe informed Hart that Hart would be removed from the IRS, effective May 20, 2011.  Pl. Ex. at 120 at 2 (letter).  In the letter, Drenthe reviewed arguments presented on Hart's behalf at the oral reply and concluded that Hart had "not provided any documentation to support [her] allegations," as stated in the oral reply.  *Id*.

Hart's termination went into effect on May 20, 2011.  Pl. Ex. 123 (Notice of Personnel Action).  On or about May 31, 2011, Hart filed an EEO complaint alleging that she had been terminated on the basis of her sex and in retaliation for prior EEO activity.  Pl. Ex. 124

---

[9] Presumably this refers to the "Large Business and International" Division of the IRS. *See* Internal Revenue Service, "Large Business and International (LB&I) Division Directory" (Jan. 14, 2015), http://www.irs.gov/Businesses/Large-Business-and-International-%28LB&I%29-Division-Directory.

(counseling report).  As noted, this complaint triggered a long investigation by Treasury's CRD office.  *See* Pl. Ex. 126 ("abridged" CRD File).

On April 18, 2012, the CRD office mailed its final decision to Hart regarding her EEO complaint of May 31, 2011, along with a notice of Hart's right to sue in federal court.  Pl. Ex. 124 at 9, 14 (certification and notice).  The CRD office concluded that Hart "adduced no evidence that her termination was based on her protected class characteristics" and, accordingly, found no discrimination with regard to Hart's termination.  *Id*. at 9-10.  It did, however, conclude that one of Hansens's statements to Hart warranted a finding of "retaliation discrimination against" Hansen.  *Id*. at 10.  In particular, the CRD office found that Hansens's statement that Hart "'should have the guts … [to] discuss the issue with me first to attempt to resolve the issue before it is elevated to a Territory Manager, EEO or the Union' … rose to a level sufficient to chill an employee's right to pursue the EEO administrative complaint process and constituted an intrusion into the Complainant's protected rights."  *Id*.  It ordered the Baltimore office to provide three hours of training to Hansen and to take disciplinary action as appropriate.  *Id*. at 12.[10]

Hart filed suit on May 31, 2012.  ECF 1.

## Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  As the Fourth Circuit recently observed, Fed. R. Civ. P. 56 "is a mechanism

---

[10] On March 7, 2013, Hansen received a counseling memorandum.  Pl. Ex. 134 (memo and emails).  The memo cautioned Hansen "not to address an EEO compliant [sic] filed by an employee with that employee."  *Id*.

to obviate trial … ."  *Boyer-Liberto v. Fontainbleau Corp.*, 752 F.3d 350, 355 (2014), *rehearing en banc granted* (July 1, 2014), *argued* (Sept. 18, 2014).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts' showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322–24.  In resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Anderson*, 477 U.S. at 249.   Moreover, the court may not make credibility determinations on summary judgment. *Black v. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

Generally, in the face of conflicting evidence, such as affidavits, summary judgment is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See*, *e.g.*, *Boone v. Stallings*, 583 F. App'x 174 (4th Cir. Sept. 11, 2014) (per curiam).   On the other hand, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 248.   A court should award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252.

Because plaintiff is self-represented, her submissions are liberally construed.   *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).   Nevertheless, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex*, 477 U.S. at 323–24).

## Discussion

### A. Discrimination

Title VII prohibits an employer from, *inter alia*, discriminating against "any individual with respect to his compensation terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).[11]  *See*

*Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).  As amended by the Civil Rights

Act of 1991, Title VII expressly provides for "mixed-motive" liability, stating: "Except as

otherwise provided in this subchapter, an unlawful employment practice is established when the

complaining party demonstrates that race, color, religion, sex, or national origin was a

motivating factor for any employment practice, even though other factors also motivated the

practice."  42 U.S.C. § 2000e–2(m).

As the statutory language makes clear, Title VII prohibits only certain kinds of

employment actions, and only actions taken against an employee on a prohibited basis.  *See* 42

U.S.C. §§ 2000-e2(a).  In other words, first, "the existence of some adverse employment action

is required."  *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).  An

"adverse employment action" is one that "'constitutes a significant change in employment status,

such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits.'"  *Hoyle v. Freightliner,*

*LLC*, 650 F.3d 321, 337 (2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761

(1998)).  Single acts that may not be cognizable as adverse actions on their own may, over time,

cumulatively amount to an unlawful employment practice where they create a hostile work

environment.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("*Amtrak v.*

---

[11] Until Title VII was amended in 1972 by the Equal Employment Opportunity Act, Pub. L. No. 92-261 § 11, 86 Stat. 111, it did not protect federal employees.  *See* 42 U.S.C. § 2000e(b) (excluding the United States from the definition of "employer").  In 1972, however, Congress amended Title VII to provide that a federal employee who has exhausted his administrative remedies "may file a civil action as provided in section 2000e–5 of this title" against the "head of the department, agency, or unit, as appropriate."  42 U.S.C. § 2000e–16(c); *see Bullock v. Napolitano*, 666 F.3d 281, 283–84 (4th Cir. 2012), *cert. denied*, 133 S. Ct. 190 (2012).

*Morgan*"); *Hoyle*, 650 F.3d at 333-34.  But, "Title VII does not remedy everything that makes an employee unhappy." *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 329 (D. Md. 2003).  Moreover, the intentional discrimination must be on the basis of plaintiff's "race, color, religion, sex, or national origin." *See* 42 U.S.C. §§ 2000-e2(a)(1).

I previously determined that Hart either settled or failed to administratively exhaust claims related to all but one adverse action, which is her termination.  *See* ECF 28 at 24-25 (Memorandum Opinion of Sept. 13, 2013).  In her Opposition, Hart provides some discussion of the legal standard applicable to a hostile work environment claim, *see* Opposition, ECF 48 at 47-48 n.22, 48 n.23, but also expressly recognizes that the only remaining claims relate to her termination.  *Id*. at 24.[12]  Treasury does not dispute that this is an adverse action.

In her Opposition, Hart provides a lengthy argument that Title VII "proscribes gender discrimination, and not just discrimination on the basis of biological sex … ." *Id*. at 22-31.  In my previous Opinion, ECF 28, I observed that courts have disagreed about whether discrimination against transsexuals is discrimination on the basis of "sex." *Id*. at 28, 28-29 n.13.  As plaintiff correctly points out, ECF 48 (Opposition) at 22 n.9, a judge in this District recently held that discrimination based on a plaintiff's "obvious transgendered status" is a cognizable Title VII claim.  *Finkle v. Howard Cnty., Md.*, 12 F. Supp. 3d 780, 788 (D. Md. 2014) (Bredar,

---

[12]  The "ECF" page numbers are not the same as plaintiff's page numbers; after the caption and tables, the ECF page numbering corresponds to the plaintiff's numbering plus eight.

I also note that the Complaint contains scattered references to a "hostile" work environment.  *See* ECF 1 ¶¶ 26, 78, 105; *see*, *e.g.*, *id.* ¶ 131 (alleging she told certain Treasury officials that she felt "subject" to a "hostile work environment" in the Baltimore office); ¶¶ 122-23 (alleging unlawful discrimination under Title VII).  However, as discussed in ECF 28, the only claims that survived defendant's motion to dismiss were those relating to alleged sex discrimination in regard to her termination and retaliatory termination.

J.) ("[O]n the basis of the Supreme Court's holding in *Price Waterhouse,* and after careful consideration of its sister courts' reasoned opinions, this Court finds that Plaintiff's claim that she was discriminated against 'because of her obvious transgendered status' is a cognizable claim of sex discrimination under Title VII."). In any event, in its Motion, defendant does not contend Title VII's prohibition on sex discrimination is inapplicable to Hart, so I need not address the question further.

With regard to proof of intentional discrimination, "[a]s in any lawsuit, the plaintiff may prove his [or her] case by direct or circumstantial evidence." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983); *accord Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003). At trial, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *accord Price Waterhouse v. Hopkins*, 490 U.S. 228, 246 (1989).

"Applying the usual Title VII analytical construct for sex discrimination claims," the Court should "first consider whether [plaintiff] has shown any direct evidence of discrimination." *Young v. United Parcel Serv., Inc.*, 707 F.3d 437, 446 (4th Cir. 2013), *cert. granted on other grounds*, 134 S. Ct. 2898 (2014). "In the absence of that, we apply the familiar burden shifting framework articulated in *McDonnell Douglas [Corp. v. Green,* 411 U.S. 792 (1973)] and subsequent cases." *Young*, 707 F.3d at 446; *see Pettis v. Nottoway Cnty. Sch. Bd.*, –– F. App'x ——, 2014 WL 5861530, at *1 (4th Cir. Nov. 13, 2014) ("Where, as here, a plaintiff does not allege direct evidence of discrimination, a plaintiff asserting racial discrimination may avoid summary judgment by proceeding under the burden-shifting framework established in

*McDonnell Douglas* … ."); *Stokes v. Va. Dep't of Corr.*, 512 F. App'x 281, 282 (4th Cir. 2013) ("Absent direct evidence of intentional discrimination, claims under Title VII are analyzed under the burden-shifting framework established in *McDonnell Douglas* … ."); *Bryan v. Prince George's Cnty., Md.*, 484 F. App'x 775, 776-77 (4th Cir. 2012) (same); *see also Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) ("Absent direct evidence, the elements of a prima facie case of discrimination under Title VII are … ."), *aff'd*, —— U.S. ——, 132 S. Ct. 1327 (2012).

"Direct evidence must be evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal citation omitted). "Thus, evidence is direct if it establishes discriminatory motive with no need for an inference or a presumption." *Young*, 707 F.3d at 446; *see also* BLACK'S LAW DICTIONARY, "Direct Evidence" (9th ed. 2009) ("Evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.").

Where direct evidence is lacking, a plaintiff may create a rebuttable presumption of discrimination by establishing, by a preponderance of the evidence, a "prima facie case." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Diamond v. Colonial Life & Acc. Ins. Co.,* 416 F.3d 310, 318 (4th Cir. 2005) ("The Supreme Court constructed the elements of the prima facie case to give plaintiffs who lack direct evidence a method for raising an inference of discrimination.").[13]   The Fourth Circuit has said that to establish a *prima facie* case of

---

[13] As noted in *Diamond*, 416 F.3d at 318 n.4, "[i]n the event that a plaintiff … simply prefers to proceed without the benefit of the burden-shifting framework, she is under no obligation to make out a prima facie case." *See also Aikens*, 460 U.S. at 715.  In *Merritt v. Old*

discrimination under Title VII, a plaintiff must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman*, 626 F.3d at 190; *accord Gerner v. Cnty. of Chesterfield, Va.*, 674 F.3d 264, 266 (4th Cir. 2012).

If the defendant then produces, "through the introduction of admissible evidence," legitimate, non-discriminatory reasons for its disputed employment action, "the presumption raised by the prima facie case is rebutted" and "drops from the case." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).[14] The plaintiff must then "'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its

*Dominion Freight Line, Inc.*, 601 F.3d 289, 302 (4th Cir. 2010) (reversing summary judgment for defendant where evidence raised genuine dispute of material fact as to pretext), Judge Davis said in his concurrence: "The ultimate question in this case, as in all intentional discrimination cases, is *not* whether the *McDonnell Douglas* test is satisfied. It is instead, as the majority opinion teaches, whether the plaintiff has generated a genuine dispute of material fact that she is the victim of intentional discrimination, notwithstanding facially plausible reasons offered by the employer for its adverse employment action. The proof scheme is but a useful tool to help identify and resolve that real issue." Indeed, it sometimes happens that a plaintiff cannot make out a "prima facie case," but has sufficient direct evidence or circumstantial evidence to permit an inference of discrimination. *See, e.g, Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (reversing summary judgment for failure to make out prima facie case where direct evidence showed employer's policy was "discriminatory on its face"); *Lettieri v. Equant Inc.*, 478 F.3d 640, 648 (4th Cir. 2007) (reversing summary judgment for employer where district court held, *inter alia*, that female plaintiff could not make out prima facie case for discriminatory termination because she was replaced by a female, where plaintiff's replacement was hired by someone different than the person who fired plaintiff, and ample evidence otherwise supported inference of discrimination).

[14] "[A]lthough the presumption … 'drops out of the picture' … , the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citations omitted). Thus, where a plaintiff has made out a prima facie case and shown that the defendant's explanation is pretextual, the fact-finder is permitted to infer that the defendant has violated Title VII. *Id.* at 147. This will often, but not always, be enough to sustain judgment as a matter of law for plaintiff. *Id.* at 148.

true reasons, but were a pretext for discrimination.'" *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253).

To show pretext, a plaintiff must proffer sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation is false or "'unworthy of credence,'" *Mereish v. Walker,* 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Burdine,* 450 U.S. at 256), and that discrimination or retaliation was the true reason for the adverse employment action.  *Hicks*, 509 U.S. at 515 (plaintiff must prove "*both* that the reason was false, *and* that discrimination was the real reason"); *accord Adams v. Trustees of Univ. of North Carolina–Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011).

In assessing the defendant's proffered reasons, as the Fourth Circuit has "repeatedly observed," it is not a court's "'province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination.'"  *Walker v. Mod-U-Kraf Homes, LLC,* —— F.3d ——, No. 14-1038, 2014 WL 7273031, at *8 (4th Cir. Dec. 23, 2014) (alterations omitted) (quoting *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 299 (4th Cir. 1998) (citation and internal quotation marks omitted)). When the question at issue is whether the decisionmaker acted with discriminatory animus, only the "perception of the decision maker" is "relevant to the question."  *Hux v. City of Newport News, Va.*, 451 F.3d 311, 319 (4th Cir. 2006) (citations omitted).  Thus, "the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it."  *Id*. at 315.

Similarly, the beliefs of an employee who does not make the employment decision at issue, or intentionally and proximately cause it, will generally not be relevant to the pretext

question. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 131 S. Ct. 1186, 1194 (2011) (holding employer liable for act motivated by antimilitary bias where employee intentionally and proximately caused act, but was not de facto decisionmaker); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004) (en banc) (holding employer responsible under Title VII and ADEA for actions of employee "principally responsible for the decision or the actual decisionmaker"); *see also Vicino v. Maryland*, 982 F. Supp. 2d 601, 611 (D. Md. 2013) (synthesizing cases). However, evidence that many employees shared a common discriminatory animus may be evidence of a "corporate culture" likely to have influenced the decisionmaker. *See, e.g., Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir. 2010) ("While the views of others are no proof of the views of Stoddard, at some point the corporate environment in which he worked places Stoddard's own selective use of [a particular physical test] in Merritt's case in a less neutral context."); *Young*, 707 F.3d at 449.

In this case, Hart points the Court to the following incidents in support of her argument that she was terminated because of her sex, ECF 48 at 43 (Opposition) (internal citations omitted):

> Plaintiff alleges that Hansen made several inappropriate remarks regarding the Plaintiff's transition from male to female. In particular, the Plaintiff alleges Hansen commented on her appearance, which led another manager, Eugene Buchs, to advise Hansen to "[not] even go there;" "set a tone for the workgroup," that prompted Plaintiff to request EEO sensitivity training for the workgroup; criticized Plaintiff's skirt length; made false accusations [citing Hansen email chastising Hart for allegedly taking a file from his office, Pl. Ex. 52]; and was otherwise hostile and disrespectful toward the Plaintiff [citing Pl. Ex. 33, emails in which Hart alleged Hansen told Hart her skirt was too short, did not say hello, but greeted a colleague at a conference, and "set a tone for the rest of" Hart's workgroup at meetings in September, 2009 that led to ridicule; and Pl. Ex. 124, 126, and 127, which contain the results of and documents compiled in the IRS's investigation of Hart's termination]. Additionally, the Plaintiff alleges that Tobias failed to take appropriate disciplinary action after the Plaintiff reported that a

coworker (Curry) had made inappropriate remarks about the Plaintiff's prior EEO
complaints and her sex [citing Pl. Ex. 53, 57, emails in which Hart alleged Curry
offended her on June 29, 2009; Pl. Ex. 126, the CRD File; and Pl. Ex. 143 at 2, an
apparently irrelevant email].

Further, Hart argues that her supervisors' "attempt[s] to impede her gender transition" are
evidence of discriminatory bias.  She cites as evidence the following: exhibits relating to her
efforts to get a key to the women's restroom at the Fairfax office; the fact that she received
discipline while her key request remained outstanding; Hansen's "request for medical
documentation for Plaintiff's proposed use of sick leave in connection with her sex change
surgery;" and Hansen's refusal to complete Hart's workload reviews over the phone, rather than
in person.  ECF 48 at 44.  And, Hart argues that she was "treated less favorably after her gender
reassignment surgery," as evidenced by the fact that her performance review ratings decreased
after her surgery, and "the severity and frequency of disciplinary action from IRS Management"
increased after she began her gender transition.  *Id.*

None of this points the Court to any direct evidence that the IRS fired Hart because of her
sex.  That is to say, nothing discussed by Hart in her Opposition, or in the record, "establishes
discriminatory motive with no need for an inference or a presumption."  *Young*, 707 F.3d at 446;
*see also*, *e.g.*, *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir. 2010) ("A
regional vice president remarked, for instance, that he 'didn't think a girl should have that
[Pickup and Delivery] position.' …  An operations' manager stated, '[t]his is not a woman's
place.'") (alterations in *Merritt*); *Baqir v. Principi*, 434 F.3d 733, 744 (4th Cir. 2006) ( "Elliston
told her 'that "age [was] the major and only factor"' for Baqir's discharge … .").

"In the absence of direct evidence," Hart may rely on the *McDonnell Douglas* burden-
shifting framework to create a presumption of discrimination.  *See*, *e.g.*, *Stokes*, 512 F. App'x

281. However, where, as here, defendant has produced admissible evidence of a legitimate, nondiscriminatory reason for the adverse employment action, Hart's claims can only survive a motion for summary judgment if Hart's evidence creates a genuine dispute of material fact. In other words, I must determine if the evidence could persuade a reasonable juror that defendant's proffered reasons are mere pretext, *and* that the real reason for the action was unlawful discrimination. *See*, *e.g.*, *Adams*, 640 F.3d at 560.

Because no reasonable juror could find that defendant's proffered reasons were mere pretext, I begin an end with the "pretext" analysis. *See*, *e.g.*, *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) (citation omitted) ("The district court ruled that even assuming that Bonds established a prima facie case, the defense articulated legitimate, nondiscriminatory reasons for her removal and Bonds failed to create a genuine issue of material fact regarding whether those reasons were a pretext for race or gender discrimination. We agree.").

The evidence produced by Hart does not create a genuine dispute of material fact as to whether the IRS fired her because of her sex. In *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir.), *cert. denied*, 543 U.S. 876 (2004), the Court said: "Under the *McDonnell Douglas* framework, in order to survive a motion for summary judgment, the plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action." Considering the facts in the light most favorable to Hart, as I must, *e.g.*, *Cashion*, 720 F.3d at 173, at best I can say that Hart truly believed that many of her colleagues and supervisors harbored a discriminatory animus toward her because of her transgender status or because she did not conform to traditional sex stereotypes. However, no reasonable juror could conclude that the IRS fired Hart *because of* discriminatory animus, rather

than because Hart point-blank refused to report to work, even when efforts were made to allay her alleged fears.

Indeed, even *if* both of the persons most involved in Hart's termination—Hansen and Tobias— harbored animus toward Hart because of her sex, the record shows that they repeatedly issued lesser discipline than they might have, *e.g.* Pl. Ex. 43A; Pl. Ex. 43; repeatedly warned her that her continued failure to report for work would result in discipline, *e.g.*, Pl. Ex. 76; Pl. Ex. 85, Pl. Ex. 94; and relied on the advice of a third-party, Gonzales, a "Labor Relations Specialist," Pl. Ex. 124 at 3, who, in turn, relied on the advice of another IRS official, GLS General Counsel Byron Smalley, to find termination would be appropriate.  *See* Pl. Ex. 126 at 91.  These are not the actions of people just looking for a pretextual reason to fire someone.  Moreover, all of this was despite the fact that Hart repeatedly told Hansen, Tobias, other IRS officials, and union representatives that she *wanted* to be fired.  *See* Pl. Ex. 49; Pl. Ex. 55; Pl. Ex. 56; Pl. Ex. 73; Pl. Ex. 83; Pl. Ex. 143.  Those are not the words of someone looking to keep her job.

Moreover, a reasonable juror would not see most of the incidents described earlier as discriminatory.  Whatever the length of Hart's skirts, for example, Hart herself describes at least one of the skirts she wore into the Baltimore office as a "mini-skirt." *E.g.*, ECF 1 ¶ 95.  Ordinary workplace experience teaches that "mini-skirts," as opposed to "skirts," are not generally appropriate attire in a government office environment.  The record also shows that Hart perceived a request that Hart not wear "blue jeans" into the office as evincing sex discrimination.  Hart relates this belief to his (at the time) "thin posture."  Yet, it is unusual for executive or professional employees in a government office environment to wear blue jeans.  Moreover, there

is no evidence that anyone else—male, female, or male-to-female transsexual—was permitted to wear miniskirts or blue jeans when Hart was not.

Similarly, Hart has provided no evidence that Hansen or Tobias otherwise treated her differently than other colleagues in any material way. She has not, for example, provided any examples of persons who do conform to sex stereotypes, refused to "come off Flexiplace," and yet were not fired. She has maintained that Hansen permitted other colleagues to complete their workload reviews over the phone, but she has provided no evidence that this is true (other than, arguably, her own statements). She has argued that Tobias's failure to discipline Robert Curry for statements Hart claims he made shows animus; but Hart has provided no evidence that Curry actually said what Hart says he said, or that Tobias disciplined other individuals based on the unsupported, hearsay accusations of their colleagues. Rather, the evidence shows that the discipline imposed on Hart for unprofessional statements was based on eyewitness or documentary evidence, such as Hart's own words in her emails. *See* Pl. Ex. 43. Moreover, Tobias did not make the initial decision to issue that discipline; Hendricks did, and Tobias merely affirmed it in the course of a complaint settlement. *See id.*; Pl. Ex. 26 at 4.

Additionally, many of the incidents Hart cites as evidence of her discriminatory termination, *supra*, involve persons who were not involved in the termination decision, and who may not even have known the persons involved in the termination decision. For example, the evidence relating to Hart's fight to get a key to the women's restroom in Fairfax, Virginia, involved Hart; Mary Jones, her first-line supervisor in Fairfax; and Sarah Wilson, a person who otherwise appears nowhere in the record. The ridicule Hart allegedly suffered from fellow members of her workgroup in the fall of 2009, even if true, is similarly irrelevant. None of this

evidence supports the idea that the persons responsible for Hart's termination discharged her because they harbored a discriminatory animus against her, because all of this evidence relates to the beliefs of *other* persons.  *See*, *e.g.*, *Hill*, 354 F.3d at 291.

Hart did provide emails in which she asserted that Hansen once said hello to another colleague in Hart's presence, but not to Hart.  Pl. Ex. 33.  However, even assuming that happened *once*, this does not create an inference that Hansen harbored discriminatory animus against Hart because of her sex.  Viewed in the light most favorable to Hart, it shows, perhaps, that Hansen did not like Hart enough to exchange common courtesies.

In her Opposition, Hart also refers the Court to a TIGTA audit report titled "The Awards Program Complied with Federal Regulations, But Some Employees with Tax and Conduct Issues Received Awards."  ECF 48 at 57-58.  Plaintiff impies that this audit supports the argument that some IRS employees "repeatedly failed to follow management directives as she did and were not disciplined." *Id* at 57.  However, as defendant points out, ECF 49 at 4 (Reply), plaintiff "has not provided any pertinent details about these employees—such as their identities and sexes, the components of the Agency in which they worked, their supervisors, or the conduct at issue— sufficient to show … they are similarly situated to her but treated differently."

Finally, all of the arguments Hart makes in support of the proposition that the IRS's proffered reasons are merely pretextual relate to the wisdom of the IRS's decision, rather than to its motivation.  In her Opposition, Hart addresses each "Specification" given in the Removal Proposal (Pl. Ex. 111), point by point.  ECF 48 at 47-49.  In response to the Specifications under Reason 1, failure to follow management directives, Hart argues that she "overlooked and deleted Hansen's October 6, 2010 email," directing her to report to work on October 14, "without

reading it, by mistake;" that she did not report on October 19 or 20 because she "was afraid to meet alone with Hansen;" and that she did not report thereafter "because she was fearful of Hansen and she was still feeling the after-affects [sic] of the numerous medical and surgical procedures that she had undergone as part of her gender transition." *Id*.

Again, even assuming all of that is true, none of it gives rise to an inference that the IRS terminated Hart because of her sex. Nothing on the record indicates that an objective person would be "fearful" enough of Hansen to refuse to enter a building because he was in it. In her Second Declaration, for example, plaintiff offers only the following: "Hansen's line of questioning, tone, body language, and facial expression made Complainant afraid and fearful." Pl. Ex. 126 at 18. Similarly, it appears that Hart never supplied the IRS with medical documentation supporting her claim that "she was still feeling the after-affects" of the procedures she had undergone, despite invitation to do so before her final termination. *See*, *e.g.*, Pl. Ex. 111 at 6 (Removal Proposal, requesting medical documentation); Pl. Ex. 120 at 2 (Final Removal Letter, stating plaintiff did not "provid[e] any medical documentation to support the allegation … that [Hart] could not be removed from flexiplace due to [her] medical condition"). These allegations do not objectively justify plaintiff's refusal to report to work. Nor do they show that defendant's proffered reasons for Hart's termination are mere pretext.

Moreover, it is not this Court's "province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination." *Walker*, 2014 WL 7273031, at *8 (citations omitted). And, as discussed, Hart has produced no evidence to show that defendant's proffered reasons, wise or unwise, were not the true reasons for Hart's termination.

Accordingly, for the foregoing reasons, I find that defendant has shown there is no genuine dispute of material fact as to its contention that the IRS did not terminate Hart because of her sex, and I will grant summary judgment on this claim for defendant. *See Morrall v. Gates*, 370 F. App'x 396, 398 (4th Cir. 2010) (affirming summary judgment where "[t]he record demonstrates that [plaintiff] demonstrated disrespectful and disruptive conduct[,] … [h]er relationship with supervisors was difficult, and her employment was fraught with her written and verbal complaints about a variety of subjects"); *King v. Rumsfeld*, 328 F.3d 145, 149-50 (4th Cir.) (affirming summary judgment where agency "offered substantial evidence that [plaintiff] was not in fact meeting legitimate job performance expectations, chronicling in detail [plaintiff's] poor performance and his supervisors' numerous concerns"), *cert. denied*, 540 U.S. 1072 (2003).

## B. Retaliation

Title VII also prohibits employers from discriminating against an employee because the employee has filed a grievance or complaint regarding an employment practice that allegedly violates Title VII's antidiscrimination provision. *See* 42 U.S.C. § 2000e-3(a). The same "familiar" analytical framework that applies to claims for discrimination under Title VII—that is, consideration of direct evidence, and then, as appropriate, use of the *McDonnell Douglas* framework—applies to claims of retaliation under Title VII. *E.g.*, *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (applying *McDonnell Douglas* burden-shifting framework to Title VII retaliation claim); *accord Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 410 (4th Cir. 2013) (citing *Navy Fed. Credit Union* for elements of "prima facie case" of retaliation).

To be sure, as to her discharge, Hart has provided more evidence potentially supporting an inference of retaliation than of sex discrimination.  Hansen admitted, for example, that he questioned Hart about her EEO activities on October 6, 2010.  *E.g.*, Pl. Ex. 133 at 20-21 (email from Hansen to Tobias sent Oct. 7, 2010).  And, the IRS's own internal investigation determined that one of Hansen's remarks "rose to a level sufficient to chill an employee's right to pursue" civil-rights enforcement activities.  Pl. Ex. 124 at 10.

However, to avoid summary judgment, Hart must show that there is a genuine dispute of material fact as to whether she would have been terminated "in the absence of the alleged wrongful action or actions of the employer."  *See Univ. of Texas Southwestern Med. Center v. Nassar*, —— U.S. ——, 133 S. Ct. 2517, 2533 (2013).  And here, as above, considering all of Hart's evidence in the light most favorable to her, no reasonable juror could find that Hart was terminated *because of* a retaliatory animus against her.  Again, there is no direct evidence tying the alleged animus to the decision to terminate Hart.  Nor is there evidence that other persons who did not file EEO complaints and/or grievances, and who refused to report to work, were *not* fired for refusing to report to work.

Accordingly, for the foregoing reasons, defendant has shown there is no genuine dispute of material fact as to the IRS's claim that it did not terminate Hart in retaliation for her rights-enforcement activities.  Therefore, I will grant summary judgment on this claim in favor of defendant.

## Conclusion

For the foregoing reasons, I will GRANT defendant's Motion (ECF 44) and award summary judgment to defendant.

A separate Order follows, consistent with this Memorandum.


Date: February 6, 2015                         _____/s/_____
                                               Ellen Lipton Hollander
                                               United States District Judge